COMMONWEALTH vs. GREGORY N. STIRK.

Middlesex. June 7, 1982. — June 30, 1983.

Present: HALE, C.J., GRANT, & DREBEN, JJ.

*Constitutional Law*, Assistance of counsel, Confrontation of witnesses.
    *Conflict of Interest. Practice, Criminal,* Assistance of counsel, In-
    structions to jury. *Evidence,* Relevancy and materiality.

There was no actual conflict of interest between the defendant in a mur-
    der case and an attorney who had been a suspect in the case for a short
    period of time during the initial stages of police investigation and who
    had advised the defendant before the defendant made a statement to
    police admitting the killing, inasmuch as at the time the attorney ad-
    vised the defendant the attorney was no longer a suspect, and no
    longer considered himself to be one. [283-284] DREBEN, J., dissen-
    ting.
The Commonwealth's failure in a murder case to call as a witness an
    individual who had given certain information to police investigating
    the case did not deprive the defendant of his constitutional right to
    confront his accuser. [284]
At the trial of a murder case in which the defendant admitted the killing
    but claimed that he had acted in self-defense when the victim attacked
    him after the defendant had refused the victim's homosexual advances,
    there was no error in the exclusion of testimony of the defendant's
    mother that as a boy the defendant had been subjected to a "homosex-
    ual assault." [285]
At the trial of a murder case, certain phrases in the judge's instruction
    to the jury did not improperly shift the burden of proof on the issue of
    malice from the Commonwealth to the defendant. [285-286]

INDICTMENT found and returned in the Superior Court
Department on October 12, 1979.

The case was tried before *Prince,* J.

*Steven J. Rappaport* for the defendant.

*Robert L. Rossi,* Assistant District Attorney, for the Com-
monwealth.

HALE, C.J.  The defendant has appealed from his convic-
tion of murder in the second degree on an indictment charg-

ing murder.  After the appeal was argued, we were of opin-
ion that the principal issue in the case could not properly be
decided unless specific findings of fact were to be made by
the trial judge as to whether there was a genuine conflict of
interest between the defendant and a Mr. Sandini, a mem-
ber of the Bar, who had given the defendant legal advice
just prior to his admission that he killed the victim.  See
*Commmonwealth* v. *Hodge*, 386 Mass. 165, 167-168 (1982).
We remanded the case to the trial judge by an order of re-
mand, the pertinent parts of which are set out in the mar-
gin.[1]

The trial judge held a hearing at which the defendant
called Mr. Sandini as a witness.  The Commonwealth
called three police officers.  The judge then made com-
prehensive subsidiary and ultimate findings of fact which
have been made a part of the record on appeal.

There was evidence at trial that on the morning of August
30, 1979, a body was found in a sand pit in Hudson.  The
victim's trousers were down around his ankles.  An autopsy
revealed the cause of death to have been five stab wounds.
After learning the identity of the victim, three police of-
ficers went to his apartment where they found some T-shirts
stamped "Westboro State Hospital."  In the course of the
ensuing investigation, the officers interviewed a David
Friedman from whom, among other things, they received a
description of the automobile which the victim had been
seen to enter as a beat up old Chevrolet "with a lot of junk in
the back."  That description fit a car which the officers
knew belonged to Mr. Sandini.  The police also knew Mr.
Sandini and were aware that he knew the victim.  They
proceeded to Mr. Sandini's home, arriving there sometime

---

[1] "The case is remanded to the Superior Court, where the judge is to
make detailed findings of fact, on the question whether there was a gen-
uine conflict of interest, on the basis of evidence earlier heard by him and
to be heard on a further hearing at which the parties may present further
evidence, particularly with respect to whether Mr. Sandini knew or had
been given reason to believe that he was not a suspect at a time when he
gave the defendant legal advice."

after 10 A.M. on August 31.[2]  Mr. Sandini responded to the knock on the door and was told by Officer Sharon of the Marlborough police that Lieutenant Turner and Officer Donahue of the Hudson police and he were investigating a homicide and that they wanted to ask him some questions. They told Mr. Sandini that the victim had been seen getting into a motor vehicle similar to his in the early morning hours of August 30.  At Mr. Sandini's insistence, Miranda warnings were given to him, although Officer Sharon told him that he was not a suspect.  Mr. Sandini then informed the officers that he had been asleep all of the night in question. At about this time the defendant walked into the room, and the officers recognized that the defendant, and not Mr. Sandini, fit the description they had received of the driver of the car.  Miranda warnings were then given to the defendant and to Mr. Sandini at the same time.  Both Mr. Sandini and Stirk answered questions willingly, although Mr. Sandini at that time was disturbed "because he felt he was a suspect, which Officer Sharon denied."

The defendant told the police that he had been using Mr. Sandini's car as his own vehicle needed repairs.  He denied knowing the victim and then, after a reminder from Mr. Sandini, admitted that he did.  He said that he could not sleep in the early morning hours of the thirtieth and had taken Mr. Sandini's car to "get a snack."

The defendant was then informed that the police had a witness they wanted to have look at him.  He agreed but said that he had to go to a "job site" but would be back in time.  While he was gone, the defendant had his hair cut. He later said he had done so because he was to march in the Labor Day parade.

On observing the defendant, the witness said that the defendant looked like the man he saw but that his hair looked different.  Mr. Sandini was not present at this time.

Shortly after noon on the thirty-first, the defendant voluntarily went to the Marlborough police station for further

---

[2] From this point, our summary is taken from the judge's findings after remand.

questioning, where he was again given Miranda warnings. At about 2:00 P.M. he called Mr. Sandini to come to the station and to bring him some cigarettes. When Mr. Sandini arrived, he conferred privately with the defendant. The conference was interrupted for a short period of time as Mr. Sandini had not brought cigarettes and left to obtain them. Prior to this conference, the defendant, but not Mr. Sandini, was again given the Miranda warnings. After this conference the police questioned the defendant in Mr. Sandini's presence, with none of the questions being directed to Mr. Sandini. He and the defendant were about to be excused when one of the officers mentioned getting a warrant to search Mr. Sandini's automobile. Mr. Sandini said there was no need to get a warrant and gave them permission to search the car. The defendant also agreed to the search.

A blood stained shirt and a shirt marked "Westboro State Hospital" were found. As to the former, the defendant said that the blood stains were from a bleeding pimple on his back. When the latter shirt was produced, the defendant asked if he could confer with Mr. Sandini. They had a private discussion, after which Mr. Sandini asked if he could take the defendant home for a day or two so that he might talk to him some more. That request was denied, and the defendant was arrested. A further private conference was held between Mr. Sandini and the defendant, following which the defendant signed a Miranda rights document and then said, "I did it," adding that he had acted in self-defense.

At trial, at which the defendant was represented by other counsel, the defendant admitted the killing but claimed he had acted in self-defense when the victim attacked him after the defendant had refused the victim's homosexual advances.

1. The defendant claims that he was denied the right to the assistance of impartial counsel to "advise him in an unbiased manner." He argues that since Mr. Sandini was a suspect in the homicide, he had a genuine conflict of interest with that of the defendant and that Mr. Sandini was not,

therefore, in a position to give "unrestricted" advice and, further, that Mr. Sandini, as a suspect, had an interest in placing responsibility for the crime on the defendant. Mr. Sandini thus was not, the defendant argues, in a position to advise the defendant in an unbiased manner. That argument would warrant a new trial if it were based on a sound factual premise. However, the judge found that except for a short period of time during the initial stages of the investigation, Mr. Sandini was not a suspect and knew that he was not a suspect. The judge ultimately concluded "that there was no genuine conflict of interest between Sandini and Stirk at a time when he gave the defendant legal advice." The judge's findings, all of which were warranted by the evidence, thus remove the factual underpinnings from the defendant's argument and for that reason the argument fails.

The defendant makes a further argument in which he asserts as a part of the above claim that, because Mr. Sandini had been suspended from the practice of law at the time that he advised him, the defendant was denied the right to counsel. (Mr. Sandini testified that he had been suspended from the practice of law on March 29, 1979, for failing to pay his "annual dues" to the Board of Bar Overseers and that he was reinstated on October 30, 1979.) The defendant makes no argument that this in any way affected Mr. Sandini's legal ability or his representation of the defendant. As the defendant makes no argument beyond a bare assertion, it does not rise to the level of appellate argument. *Tobin* v. *Commissioner of Banks*, 377 Mass. 909 (1979).

2. The Commonwealth did not call David Friedman as a witness, which gives rise to the defendant's claim that he was denied his constitutional right to confront his accuser. There is nothing in the record to indicate that the defendant had any desire or need to have Friedman testify. The Commonwealth had no duty to call any particular witness. *Commonwealth* v. *Sacco*, 259 Mass. 128, 141 (1927). The defendant knew who Friedman was and could have called him to testify had he considered it desirable or necessary.

3. The defendant claims prosecutorial error in the closing argument, to which no objection was registered. The argument now complained of was not improper, and there is no risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967).

4. The defendant assigns as error the exclusion of proffered testimony of his mother that as a youngster the defendant had been subjected to a "homosexual assault." He argues that the "testimony would have enabled the jury to determine whether the deceased's homosexual assault upon the defendant was likely, in the circumstances of this case, to have provoked such a state of passion, anger, fear, fright or nervous excitement as would have eclipsed his capacity for reflection or restraint. The testimony would have been relevant to the defendant's actual state of mind at the time he delivered the fatal wounds upon the deceased." Assuming arguendo that the "assault" was in fact homosexual, the judge rightly deemed the offered testimony too remote. Moreover, in the absence of any tender of expected expert testimony as to the likelihood of an earlier assault's having the effect contended, the evidence was irrelevant. See *Commonwealth* v. *Trainor*, 374 Mass. 796, 806 (1978); 6 Wigmore, Evidence § 1871 (Chadbourn rev. 1976).

5. Finally, the defendant claims that two phrases ("so, unless the evidence in the case leads you as jurors to a different, contrary conclusion" and "unless by the evidence of all the facts and circumstances it's disproved in your minds" [the latter was once repeated]) in the judge's instructions to the jury shifted the burden of proof of malice from the Commonwealth to him.[3]

---

[3] The following is the context in which those phrases appear:

"As a general rule, it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of his acts knowingly done or knowingly omitted to be done, so unless the evidence in the case leads you as jurors to a different, contrary conclusion the jury may draw the inference and find that the accused intends all the natural and probable consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act done or knowingly omitted to be done by the accused."

"Where the killing is caused by the intentional use of a deadly weapon — a knife, a gun are deadly weapons — malice may be inferred unless

Relying on *Commonwealth* v. *Callahan*, 380 Mass. 821, 822-826 (1980), and *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 248-249 (1980), the defendant seeks to excuse the failure of trial counsel to object to the charge because the "constitutional theory upon which the defendant relies . . . was not sufficiently developed at the time of the instant trial." He argues that the quoted phrases raise a "presumption of malice", as opposed to permission for the jury to draw an inference of malice.

We note first that except for the instruction on presumption of innocence the word "presumption" does not appear in the judge's charge. We also note that the judge and trial counsel appear to have been well aware that the judge's charge "must not be phrased so as to establish a presumption in favor of the Commonwealth which the defendant must overcome." *Commonwealth* v. *Callahan*, 380 Mass. at 825. At a conference with counsel held before arguments and charge, the judge stated that wherever the word "presumption" appeared in the defendant's requests for instructions he would use "inference" in its place. The defendant's counsel concurred. For the reasons stated in *Callahan*, *id.* at 824-826, the court and counsel were bound to be aware, as they obviously were, of the importance of the strictures involved in the use of the word "presumption."

We have read the judge's carefully crafted charge and have concluded that it could not have given the jury the impression that it relieved the Commonwealth of its burden of proof. In all probability that is the reason why defense counsel did not object.

*Judgment affirmed.*

DREBEN, J. (dissenting in part). I concur in the opinion of the majority on the phases of this case apart from the

by the evidence of all the facts and circumstances it's disproved in your minds."

alleged conflict. I am unable to join in their acceptance of the trial judge's ruling that "there was no genuine conflict of interest between Sandini and Stirk" at the time Stirk was interrogated at the Marlborough police station prior to his confession. This ultimate ruling is a "mixed determination of law and fact," *Cuyler v. Sullivan,* 446 U.S. 335, 342 (1980), which "may give rise to a meaningful appeal, even in a case where [the judge's] subsidiary findings are beyond practical challenge." *Commonwealth v. Moon,* 380 Mass. 751, 756 (1980).

As the majority opinion notes, the judge's subsidiary findings indicate Mr. Sandini believed he was a suspect in a first degree murder investigation at the time he and Stirk were first questioned. Indeed, the judge in his ultimate findings (labeled "conclusions of fact") stated, "In the initial stages of the police interrogation . . . [Mr.] Sandini had been given reason to believe and did believe he was a suspect even though the police assured him he was not."

Despite the judge's careful subsidiary findings, which I fully accept, I cannot agree with his "conclusion of fact" that Mr. Sandini knew he was not a suspect in the afternoon and, therefore, no actual conflict existed when he acted as the defendant's legal adviser. Wholly discounting Mr. Sandini's testimony at trial and at the supplementary hearing, that he did not consider himself free of suspicion until Stirk confessed,[1] I conclude that neither the evidence nor the judge's subsidiary findings support his conclusion that the conflict found to have existed in the morning had dissipated by afternoon.

The crime involved was first degree murder and the connections to Mr. Sandini were substantial. The police knew that Mr. Sandini had known the victim and had driven him in his car on prior occasions. The victim was last seen alive

---

[1] Mr. Sandini's testimony at trial was obtained through threat of subpoena, but he testified voluntarily at the hearing on remand. He consistently took the position (rejected by the judge) that he was not the defendant's legal adviser. The judge's finding that Mr. Sandini acted as Stirk's counsel is warranted by the evidence.

in Mr. Sandini's Chevrolet. Although Stirk admitted that he had used the automobile on the night in question, Stirk was a close associate and shared an apartment with Mr. Sandini. Even if Stirk had driven the car and was the prime suspect, there was nothing to indicate that only one person was implicated in the murder. Mr. Sandini's knowledge that he had been home alone in bed would not carry much force if an alibi were needed. At the time of the interrogation at the police station, the crime had not yet been solved. When the officers left in the morning Stirk was not under arrest and was free to leave. This was also true in the afternoon. In fact, Stirk and Mr. Sandini were about to go home prior to Mr. Sandini's volunteering to have his car searched.

In these circumstances, I cannot but conclude that the interests of Mr. Sandini and those of Stirk were divergent. Until the crime was solved, Mr. Sandini could reasonably consider himself a suspect. Cf. *United States* v. *Hurt,* 543 F.2d 162, 167 (D.C. Cir. 1976); *Commonwealth* v. *Duffy,* 483 Pa. 170, 175 (1978). It was in his strong personal interest to have a speedy resolution of the matter, a resolution which could be achieved by an arrest and a confession. Stirk's interests were obviously different; counsel with undivided loyalties would clearly advise against a confession. "[A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Escobedo* v. *Illinois,* 378 U.S. 478, 488 (1964), quoting *Watts* v. *Indiana,* 338 U.S. 49, 59 (1949) (Jackson, J., concurring in part and dissenting in part). See also *Commonwealth* v. *Brant,* 8 Mass. App. Ct. 558, 571 & n.7 (1979) (Brown, J., dissenting), rev'd, 380 Mass. 876, cert. denied, 449 U.S. 1004 (1980).

Accordingly, it is my view that the defendant has demonstrated tensions between the interests of Mr. Sandini and himself which show an actual, relevant conflict of interest. See *Commonwealth* v. *Michel,* 381 Mass. 447, 451-452 (1980), and authorities cited. See also *Commonwealth* v. *Hodge,* 386 Mass. 165, 167-168 (1982).[2]

---

[2] I note that if the protections of art. 12 of the Massachusetts Declaration of Rights apply here, the defendant need not show what advice he re-

Commonwealth *v.* Stirk.

Since I am outvoted on the question of conflict, I need not decide the issues raised by the Commonwealth, particularly the issue of waiver of conflict, which may have to be decided even if an actual conflict of interest is found.

ceived from Mr. Sandini. "[H]aving established a genuine conflict of interest, [the defendant] was required to prove neither actual prejudice nor adverse effect on his . . . counsel's performance . . . ." *Commonwealth* v. *Hodge,* 386 Mass. at 170.