Commonwealth vs. Hiram Estremera.

Worcester. February 3, 1981. — April 13, 1981.

Present: Hennessey, C.J., Braucher, Wilkins, Liacos, & Abrams, JJ.

*Homicide. Malice. Practice, Criminal,* Examination of jurors, Instruction to jury. *Jury and Jurors.*

A judge's refusal to permit voir dire examination of prospective jurors on subjects relating to the defense of insanity did not constitute a denial of due process, a violation of G. L. c. 234, § 28, or an abuse of discretion; nor was the defendant prejudiced by the fact that the judge initially allowed the questions but thereafter disallowed them in order to hasten the jury selection process. [387-389]

During the empanelment procedure in a criminal case, there was no error in the manner in which the judge questioned the prospective jurors about their exposure to pretrial publicity where the record showed that questions about publicity were posed initially to the entire venire and that each seated juror was then subjected to individual inquiry on the subject. [389-391]

At a murder trial, evidence that the victim had been directing obscenities and insults at the defendant and had threatened to kill him at some future time was insufficient to establish the kind of provocation which would have entitled the defendant to an instruction on voluntary manslaughter [391-392]; nor was there evidence that the defendant had engaged in intentional wanton or reckless conduct so as to entitle him to an instruction on involuntary manslaughter [392-393].

There was no merit to a defendant's contention that the judge in his charge described the permissible inference of malice in terms of a conclusive or mandatory presumption. [393-394]

Although the judge at a murder trial failed to define malice as requiring proof of intent, there was no reversible error where his instructions on criminal responsibility, focusing on the defendant's mental state, were equivalent to a proper instruction on malice. [394-396]

Indictment found and returned in the Superior Court Department on July 11, 1979.

The case was tried before *Chmielinski,* J.

After review was sought in the Appeals Court the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Thomas F. McEvilly (John J. Curley, III,* with him) for the defendant.

*Daniel F. Toomey,* Assistant District Attorney (*Richard Withstandley,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J. Some time after midnight on June 21, 1979, Angel Luis Allende was shot in the face and killed by the defendant, Hiram Estremera, a police officer with the Worcester Housing Authority. The killing occurred while Allende was handcuffed and sitting in the back seat of a police cruiser driven by Estremera. The key issue at trial was Estremera's criminal responsibility. A jury found Estremera guilty of murder in the second degree. He appeals pursuant to G. L. c. 278, §§ 33A-33G, claiming error in the empanelment process, in the trial judge's instructions on malice, and in the judge's failure to instruct the jury on manslaughter. Finding no reversible error and no occasion to exercise our powers under § 33E, we affirm the judgment.

The defendant Estremera and Angel Rosario, police officers employed by the Worcester Housing Authority (authority), were on cruiser patrol at Great Brook Valley Housing Project (project) on the evening of June 20, 1979. Estremera was the driver. About 12:30 A.M., the officers noticed a car drive out of the project with a stove in the trunk. Believing the stove might be the property of the authority, they followed and stopped the car. Two men were in the car. Estremera asked the driver, Allende, for his license and registration, which were produced promptly. Estremera recognized Allende's face; he had stopped Allende in the past for motor vehicle violations and had been given a "rough time." When asked by Rosario where he had obtained the stove, Allende replied that his sister had given it to him. Estremera called for a backup, and another authority police officer, Terrance J. Ferraro, arrived in

another cruiser. Ferraro's arrival somehow aggravated Allende, who began swearing viciously and accused the officers of harassing him. Allende punched Ferraro. Ferraro grabbed Allende, arrested him for assault and battery, and handcuffed his hands behind his back. Estremera patted down Allende for weapons and found an "Afro pic" (a comb) and a small knife.

Allende continued to hurl obscenities at the officers while he was being escorted to Estremera's cruiser by Ferraro and Estremera. He claimed that there would be a riot in the project and that he would burn the project down. He also threatened to kill the officers. Most of the taunts and threats were in Spanish;[1] Estremera and Rosario are Puerto Rican, as was Allende.

Allende was put in the back of the cruiser for transport to the police station. Rosario drove Allende's car toward the station, with the unidentified passenger still inside; Estremera followed in his cruiser with Allende; and Ferraro brought up the rear. Ferraro testified that Estremera seemed normal at the time the three cars began making their way toward the police station. After driving about 100 feet, Rosario heard a sound "like a gunshot"; looking at the side-view mirror, he saw Estremera getting out of his cruiser. Ferraro testified that while driving behind Estremera, he saw Estremera swing the cruiser from the right-hand lane into the left-hand lane, jam on the brakes and get out. Ferraro pulled up behind him. Estremera opened the back door and pulled Allende's body out onto the ground. On seeing Allende's face covered with blood, Ferraro called for an ambulance. Officer Rosario heard Ferraro's voice over the radio and, after delivering Allende's car to the station, returned in his own car. Rosario testified that Estremera was crying hysterically; attempts to calm

---

[1] Among the invectives flung at the officers was the Spanish word "cabron," a term roughly equivalent to "cuckold" and characterized by Estremera as the worst and "the most hurting" word one could say in Spanish.

him were unavailing. Estremera said he did not know what had happened and told Rosario to "save the guy." According to Ferraro, Estremera cried, "God, don't let him die. I shot him." Ferraro said Estremera was confused, hysterical, "[o]ut of the ball park." Estremera ripped off his shirt and equipment and threw them into the street. An ambulance arrived and took the unconscious victim to the hospital, where he died minutes later. His brain had been perforated by a gunshot wound through the left eye.

Estremera's was the only testimony of the events immediately leading to Allende's death. He testified that Allende's vituperation continued unabated after the two of them were alone in the cruiser. Allende again predicted a riot in the project and threatened to kill Estremera and the other officers. Estremera became "mad" and told Allende to shut up. Estremera then heard a pop. He looked to the right where the sound had come from and, as he continued to drive, realized that he had his revolver in his right hand. He then slammed on the brakes, stopped the cruiser, stepped from it, and looked around to determine where the noise had come from. As he was getting back into the cruiser, he noticed that Allende was quiet. He opened the rear door and spoke to Allende. Allende lifted his head, and Estremera saw blood oozing from his left eye. He removed Allende from the cruiser and placed him on the pavement.

The defense claim at trial was lack of criminal responsibility.[2] According to psychiatric testimony, Estremera suffered from a mental disease identified as a "cathathymic crisis within the context of a hysterical dissociation," as a result of which he was "grossly temporarily unaware" of what was going on at the time of the shooting. The defendant also introduced evidence of a radical personality change caused by a series of psychologically traumatic experiences, including a miscarriage suffered by his wife; mysterious,

---

[2] In anticipation of this defense, the Commonwealth presented its own expert psychiatrist, who testified that Estremera was criminally responsible at the time of the shooting.

silent telephone calls; the stealing and burning of his car near the project; and previous riots at the project, during one of which a superior officer was seriously injured.

1. *Propriety of the Empanelment Process.*

The defendant attacks the judge's actions in striking certain questions to prospective jurors after the first day of empanelment and in otherwise altering the empanelment process in order to save time. Consideration of the defendant's challenges requires us to set out in some detail the particular method followed for the selection of the jury in this case.

On the day before the trial was to begin, the defendant filed a motion for leave to question prospective jurors, reciting twenty-five questions he wished to have put to each juror. The first two questions concerned the juror's relationship to the defendant and prospective witnesses. Questions 3 through 11 involved pretrial publicity and its impact, if any, upon the juror. The twelfth question involved the juror's ability to consider only evidence adduced at trial. The next seven questions were aimed at discovering any prejudice against either Puerto Ricans or police officers. Questions 20 through 25 focused on the juror's attitudes toward psychiatrists and the defense of lack of criminal responsibility. The judge allowed the motion except with respect to the twelfth question[3] and agreed to pose the questions to each juror individually.

On the first day of empanelment, seven prospective jurors were questioned individually and out of the presence of the others,[4] in accordance with the defendant's request. Of the seven, two were deemed acceptable and were sworn.

On the second day, concerned that the previous day's proceedings had resulted in the selection of only two jurors, the judge decided to alter the empanelment process in order

---

[3] The defendant is not challenging the refusal to ask question 12.

[4] Although it is not always clear from the transcript that only one juror was in the court room during each examination, we may infer from the judge's comments and from the defendant's omission to claim to the contrary that each juror was interrogated out of the hearing of the others.

to save time. He announced his intention to pose questions relating to pretrial publicity to the entire venire collectively. Furthermore, none of the questions dealing with attitudes toward psychiatrists and the defense of lack of criminal responsibility were to be posed any longer. The defendant objected to these alterations.

a. *Questions on criminal responsibility.* The defendant claims that the striking of questions revolving around the defense of lack of criminal responsibility[5] constituted both a denial of due process and an abuse of discretion. He cites two cases from other jurisdictions for the proposition that it *is prejudicial error to refuse to permit voir dire examination* of prospective jurors on subjects relating to the defense of insanity, when the defendant has given notice of such defense.[6] The cases cited are not constitutionally based and contain little or no reasoning in support of their conclusions. We have recently reaffirmed that "[q]uestions not aimed at 'revealing racial bias or any similarly indurated and pervasive prejudice' are not constitutionally required" on voir dire. *Commonwealth* v. *Rhoades,* 379 Mass. 810, 821

---

[5] The questions Estremera wished to have asked, and that were in fact asked of the jurors empaneled on the first day, were these:

"(20) Are you aware that the law does not hold a person criminally responsible for his acts if because of mental disease or defect he lacked the substantial capacity to appreciate the wrongfulness of his conduct?

"(21) Are you aware that the law does not hold a person criminally responsible for his acts if because of mental disease or defect he lacked the substantial capacity to conform his conduct to the requirements of the law?

"(22) Do you agree with both of the last two propositions of law?

"(23) Having been asked these questions and after now being told that the Defendant is an hispanic police officer, can you, as a Juror state that you stand indifferent, that is, that you will be impartial and decide the case solely upon the evidence produced at trial.

"(24) Do you understand and accept that psychiatrists are medical doctors who specialize in the diagnosis and treatment of mental diseases and defects?

"(25) Do you harbor any prejudice against physicians engaged in the practice of psychiatry?"

[6] *Washington* v. *State,* 371 So. 2d 1108, 1109 (Fla. Dist. Ct. App. 1979). *State* v. *Olson,* 156 Mont. 339, 345 (1971).

(1980), quoting from *Commonwealth* v. *Bailey,* 370 Mass. 388, 399 (1976). We cannot say that whatever prejudice might exist against psychiatrists is sufficiently "indurated and pervasive" as to result in a denial of constitutional rights if not explored before trial. Nor do we consider the refusal to ask questions such as those at issue here a violation of the statute governing jury selection, G. L. c. 234, § 28, or an abuse of the discretion afforded the judge in the jury selection process. See *Commonwealth* v. *Dickerson,* 372 Mass. 783, 794 (1977). In fact, we have earlier considered it "a doubtful proposition that [such] questions . . . need be asked in every case involving testimony by psychiatrists and the defense of insanity." *Commonwealth* v. *Killelea,* 370 Mass. 638, 649-650 (1976) (finding no abuse of discretion in denying a defendant's motion to propound questions similar to those requested by the defendant here). The present record, as was true in *Commonwealth* v. *Shelley,* 381 Mass. 340, 353 & n.12 (1980), "contains nothing to make that [doubtful] proposition seem more plausible." At oral argument the defendant maintained that popular attitudes toward psychiatrists are largely negative and suggested that terms such as "headshrinker" indicate a common belief that psychiatrists are not credible. But we are not prepared to assume today, any more than we have been in the past, that there is such widespread prejudice against psychiatrists and the concept of criminal irresponsibility as to mandate pretrial inquiry on those subjects. See *Commonwealth* v. *Ricard,* 355 Mass. 509, 511-512 (1969). Absent some reason to suspect that jurors may be so prejudiced, see *Commonwealth* v. *Campbell,* 378 Mass. 680, 696 (1979), a judge is warranted in relying upon his final charge to the jury to purge any bias from the jurors prior to their deliberations.

The fact that the questions were initially allowed by the judge and asked on the first day of empanelment, but not thereafter, does not change matters. The defendant contends he was prejudiced because he relied on the allowance of the questions; when he was told unexpectedly on the second day of empanelment that the questions would no longer

be asked, little or no opportunity remained for investigating prospective jurors. The defendant does not say what he would have done differently had the judge not allowed the questions in the first place. Certainly, any investigations of jurors' attitudes toward psychiatrists and the defense of lack of criminal responsibility would have been constrained by our prohibition against direct contact with prospective jurors and members of their families. See *Commonwealth v. Allen,* 379 Mass. 564, 576, 578 (1980). In these circumstances, absent any showing of prejudice, the subsequent striking of the questions at issue cannot be deemed to have impaired the defense. Contrary to the defendant's assertion, the mere fact that the judge modified the empanelment process in order to speed up the proceedings does not make the modification an abuse of discretion requiring reversal.

b. *Questions on pretrial publicity.* The defendant claims error in the manner in which the judge questioned prospective jurors about their exposure to pretrial publicity. He alleges that collective questioning on this subject violated G. L. c. 234, § 28. The defendant's concern about possible prejudicial publicity had prompted his request that the judge pose a series of questions to jurors about what they had heard and whether they had formed an opinion about the case.[7] After the first day of empanelment, again for rea-

---

[7] The following questions were requested and were posed to each juror individually on the first day of empanelment:

"(3) What newspapers do you read?

"(4) Have you read about this case in the newspapers or heard about it over the radio or on television?

"(5) What have you read or heard?

"(6) Have you conversed with any other person about this case?

"(7) Have you formed or expressed an opinion in regard to this case?

"(8) Do you have any interest in this case?

"(9) Have you read in the newspapers or heard over the radio or on television about disturbances at Great Brook Valley during the month[s] of May and June, 1979?

"(10) What did you read or hear?

"(11) Have you formed an opinion or developed an attitude as a result of this information which would effect or have an impact upon your decision in this case?"

sons of judicial economy, the judge indicated that he was changing the procedure for posing questions relating to pretrial publicity.  Addressing the entire venire, the judge began by delivering a short statement of the case, saying the defendant was accused of a homicide arising out of an incident in the Great Brook Valley Housing Project on June 21, 1979.  He then asked whether anyone had formed an opinion about the facts of the case.[8]  One juror responded affirmatively, and the judge excused her after asking her further questions out of the hearing of the other jurors.  The judge next asked whether any juror was conscious of any bias or prejudice with respect to the case.  No one responded.  Turning to the subject of pretrial publicity, the judge said:  "This case, as I understand it, was the subject of a lot of newspaper and media publicity.  How many of you ladies and gentlemen have read something about this case?"[9]  A number of hands went up.  When the judge asked whether any one had formed an opinion from or been affected by what he or she had read,[10] no one responded.  A list of the names of prospective witnesses and of counsel was then read to the venire, who were asked whether they were related to or acquainted with any of the persons named.  The jurors who responded affirmatively had further questions put to them individually.  The collective inquiry of the venire was then over.  The jurors retired to the jury room, and from then on were brought in only for individual examination.

During each individual examination,[11] the judge asked further questions concerning the juror's exposure to publicity about the facts of the case:  what the juror had read or heard, whether it caused him or her to form an opinion as to

[8] This question corresponded to the defendant's requested question 7.

[9] This question corresponded to the defendant's requested question 4.

[10] This question corresponded to the defendant's requested question 11.

[11] Also asked individually were questions dealing with prejudice against Puerto Ricans and police officers.  These questions were taken verbatim from the defendant's motion.

what actually happened on the day in question; and wheth-
er the juror could confine his or her deliberations to the
evidence presented at trial and disregard whatever had been
heard earlier.  These questions approximated most of the
defendant's requested questions on pretrial publicity.[12] Our
reading of the record belies the defendant's assertion, on
which his claim of error is based, that the jurors were not
questioned individually about pretrial publicity.  Although
it is true that questions about publicity were posed initially
to the entire venire, we need not decide whether, in the cir-
cumstances of this case, such collective inquiry alone would
have fulfilled the requirements of G. L. c. 234, § 28, or
whether a sufficient foundation had been laid to require in-
dividual questioning.[13]  Our independent examination of
the entire empanelment procedure reveals that each seated
juror was subjected to individual inquiry concerning possi-
ble exposure to prejudicial pretrial publicity about the facts
of this case.  The defendant was entitled to no more.

2. *Failure to Instruct on Manslaughter.*

The defendant alleges that the judge erred in failing to in-
struct the jury on voluntary and involuntary manslaughter.
Such instructions were not warranted in this case, as no
view of the evidence would permit a finding of manslaugh-
ter.  See *Commonwealth* v. *Vanderpool,* 367 Mass. 743,
745-746 (1975), and cases cited.

a. *Voluntary manslaughter.*  The defendant contends
that the evidence presented allowed the jury to find he had
acted in the heat of passion upon adequate provocation, and
that therefore it was error to refuse his requested instruction
on voluntary manslaughter.  He argues that words such as

---

[12] See note 7, *supra.*

[13] For discussion of when individual questioning is required under G. L.
c. 234, §28, second par., see *Commonwealth* v. *Shelley,* 381 Mass. 340,
353 & n.12 (1980); *Commonwealth* v. *Campbell,* 378 Mass. 680, 696 &
n.12 (1979); *Commonwealth* v. *Jackson,* 376 Mass. 790, 800 & n.5 (1978);
*Commonwealth* v. *Horton,* 376 Mass. 380, 393-395 (1978), cert. denied
sub nom. *Wideman* v. *Massachusetts,* 440 U.S. 923 (1979); *Common-
wealth* v. *Dickerson,* 372 Mass. 783, 793-794 (1977).

those spoken by the victim here "may convey information sufficient to provoke a person to the extent that he could not be expected to control himself," citing as support for this proposition *Commonwealth* v. *Bermudez,* 370 Mass. 438 (1976). This argument fails to recognize the limited scope of our decision in *Bermudez.* We there reaffirmed prior holdings to the effect that verbal insults and arguments, even if obscene or hostile, cannot constitute sufficient provocation, for a reasonable person "can be expected to control the feelings aroused" thereby. *Id.* at 440-441. Acknowledging nonetheless that "certain incidents may be as provocative when disclosed by words as when witnessed personally," we left "open the possibility that, in an appropriate case, testing the defendant's response on an objective standard, sufficient provocation may be found in information conveyed to a defendant by words alone." *Id.* at 441-442. See *Commonwealth* v. *Schnopps, ante* 178 (1981) (sudden verbal disclosure of present adultery may be equivalent to the defendant spouse's discovery of the act itself and thus may constitute sufficient provocation).

The obscenities, insults, and taunts directed by the victim to the defendant Estremera are not the sort of "information" contemplated by *Bermudez.* Nor can the victim's threats to kill the defendant at some undetermined point in the future be said to convey information constituting an "immediate and intense offense" to the defendant's sensitivities, *Commonwealth* v. *Bermudez, supra* at 442, such as "would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." *Commonwealth* v. *Walden,* 380 Mass. 724, 728 (1980). As the evidence was insufficient to establish the kind of provocation considered in *Bermudez,* the judge rightly refused to give instructions on voluntary manslaughter.

b. *Involuntary manslaughter.* An instruction on involuntary manslaughter should have been given, argues the defendant, because "[i]t is possible that the defendant waved his gun and it discharged accidentally." For the re-

sulting death to be deemed involuntary manslaughter, the waving of the gun would have to be characterized as an act constituting such a disregard of the probable harmful consequences to another as to amount to wanton or reckless conduct. See *Commonwealth* v. *Jones*, 382 Mass. 387, 389-390 (1981); *Commonwealth* v. *Campbell*, 352 Mass. 387, 397 (1967). The wanton or reckless conduct that leads to manslaughter must be intentional conduct, however, *id.* at 398, and no evidence of the defendant's having waved the gun intentionally was presented at trial. Indeed, the claimed defense was that the defendant did *nothing* intentionally; there was never any suggestion that his conduct evinced a wanton and reckless disregard for the victim's safety. Because the contention that involuntary manslaughter was a possible verdict rests on a hypothesis not supported by the evidence, there was no error in failing to charge otherwise. See *Commonwealth* v. *Walden*, 380 Mass. 724, 726 (1980), and cases cited.

3. *Adequacy of the Instructions on Malice.*

The defendant challenges as deficient the judge's instructions on malice. No objection was made to the charge at the time it was given. We nonetheless review the issue pursuant to our special powers under G. L. c. 278, § 33E, as it existed prior to amendment by St. 1979, c. 346, § 2[14] (authorizing our ordering of a new trial or an entry of a lesser verdict "for any . . . reason that justice may require").

The defendant first contends that the judge in his charge described the permissible inference of malice in terms that could lead the jury to regard the inference as either a conclusive or a mandatory presumption, in violation of the principles enunciated in *Mullaney* v. *Wilbur*, 421 U.S. 684 (1975), and *Commonwealth* v. *Rodriguez*, 370 Mass. 684 (1976). We have reversed murder convictions where the

---

[14] The 1979 amendment removed from § 33E review second degree murder convictions. Such review remains available, however, where, as here, the offense resulting in a conviction of second degree murder upon an indictment for first degree murder was committed before July 1, 1979. *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980).

judge charged either that a presumption of malice arises from the intentional use of a deadly weapon or that a person must be presumed to intend the consequences of his conduct. See *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 253-254 (1980); *Commonwealth* v. *Callahan,* 380 Mass. 821 (1980). More often, however, we have concluded that language of presumption was used interchangeably with language of permissible inference, and that any erroneous equation of presumption and inference was mitigated by the charge's over-all emphasis on the Commonwealth's burden of proving every element of the crime beyond a reasonable doubt. See, e.g., *Commonwealth* v. *Chasson, ante* 183, 192-193 (1981); *Commonwealth* v. *Repoza,* 382 Mass. 119, 132-134 (1980); *Commonwealth* v. *Fitzgerald,* 380 Mass. 840, 845-846 (1980); *Commonwealth* v. *Medina,* 380 Mass. 565, 577-578 (1980); *Gibson* v. *Commonwealth,* 377 Mass. 539, 541-542 (1979); *Commonwealth* v. *McInerney,* 373 Mass. 136, 150-151 (1977). Here, the judge never even used words of presumption; he spoke of "the malice that the law implies," and told the jury they were entitled to draw logical and proper inferences from the evidence presented. He also charged at length that the Commonwealth retained the burden of proving every essential element of the crime charged. There was no danger that a reasonable juror might have interpreted the instructions as creating a constitutionally impermissible presumption or as requiring the defendant to disprove malice.

The defendant further argues that the judge's failure to define malice adequately left the jury to speculate about what facts might constitute this essential element of the crime of murder. Although we agree that, standing alone, the instruction of malice was insufficient, we conclude that, viewing the charge as a whole, the jury were adequately instructed on the mental state necessary to support a conviction of murder in the second degree.

The malice aforethought necessary for second degree murder requires a finding that the defendant intended to inflict injury on the victim without legal excuse or palliation.

*Commonwealth* v. *McGuirk*, 376 Mass. 338, 344-345 (1978), cert. denied, 439 U.S. 1120 (1979), and cases cited. Although the defendant need not have intended to kill the victim, at the very least he must have intended "to do an act creating a plain and strong likelihood that death or grievous harm will follow." *Commonwealth* v. *Huot*, 380 Mass. 403, 408 (1980). Nowhere in his instructions on second degree murder did the judge expressly define malice as requiring proof of any intent.[15] Given this deficiency, we must examine other parts of the charge referring to the defendant's mental state, "since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980).

The heart of the defense in the case at bar was the defendant's lack of criminal responsibility. The judge's thorough charge on criminal responsibility focused the jury's attention on the crucial issue of the defendant's mental state at the time of the shooting and his ability to appreciate the wrongfulness of his conduct and to conform his conduct to

---

[15] The judge defined murder as "the unlawful taking of a human life with malice aforethought and with no justification." He contrasted first and second degree murder by stating that first degree murder requires proof of "[d]eliberately premeditated malice aforethought," and "connotes a deliberate intent to kill as distinguished from second degree murder." Second degree murder was said to occur when the killing is "done without any deliberately premeditated malice aforethought but only with the malice that the law implies." The judge attempted to illustrate this with an example of a man's firing a gun into a crowd and killing somebody; he could be found guilty of second degree murder even if "he didn't really intend to kill," because "malice is implied by his us[e] of the weapon and firing it into the crowd with the probability, or possibility, that someone might well get killed." The judge did not explain that the man in the illustration must have intended to fire the gun. Although the requisite intent for second degree murder may be inferred from the *intentional* use of a deadly weapon, see, e.g., *Commonwealth* v. *Campbell*, 375 Mass. 308, 313 (1978), and cases cited, the unintentional or accidental use of a weapon cannot constitute malice. *Lannon* v. *Commonwealth*, 379 Mass. 786, 790 (1980). *Commonwealth* v. *McCauley*, 355 Mass. 554, 561 (1969). Cf. *Commonwealth* v. *Bouvier*, 316 Mass. 489, 494-495 (1944).

the requirements of the law. The instructions enlightened the jury on the relationship between the defendant's mental state and the physical act of pulling the trigger. In the circumstances of this case, the instructions on criminal responsibility were equivalent to a proper instruction on malice. Viewing the charge as a whole, we see no danger that the jury could have found the defendant guilty of second degree murder without finding an intent to fire the gun.

4. In accordance with our special duty under G. L. c. 278, § 33E,[16] we have reviewed the entire record in this case. No reason appears for reducing the offense or granting a new trial.

*Judgment affirmed.*

---

[16] See note 14, *supra.*