COMMONWEALTH *vs.* DANIEL L. DUSTIN.

Hampden.   December 7, 1983. — March 15, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, & O'CONNOR, JJ.

*Homicide.   Practice, Criminal,* Mistrial, New trial, Instructions to jury.

Publication of a newspaper article about a murder trial then in progress, in-
cluding information about a prior and unrelated murder of which the
defendant had been accused but never convicted, did not require a mis-
trial, where the judge held a voir dire of each juror individually, was
told by two jurors that they had read the headline of the article but
nothing further, where the remaining jurors had not read the article, and
where the judge sequestered the jury for the rest of the trial after ascer-
taining that no juror appeared disturbed or angry at the prospect of
sequestration. [484-485]
The defendant in a murder case was not entitled to a mistrial based on the fact
that as the jurors were walking down a corridor a custodian opened the
door to a lockup room in which the defendant was standing handcuffed
to another prisoner where the judge, after questioning the jurors, found
that fifteen of the sixteen jurors had not seen the defendant on the
occasion at issue and that one juror had seen the defendant but had not
seen any handcuffs. [485-486]
On a motion for a new trial of a murder case, the judge was warranted in con-
cluding that the testimony of two witnesses concerning a "deal" between
a government witness and the office of the district attorney was not
credible and that the testimony of these witnesses was not newly discov-
ered evidence. [486-487]
The judge at the trial of a murder case was not required to instruct the jury on
manslaughter where the evidence indicated that the victim was shot in
the kitchen of his house by a gun fired from outside through a window. [487]

INDICTMENT found and returned in the Superior Court De-
partment on February 4, 1981.

The case was tried before *Hayer,* J., and a motion for a new
trial was heard by him.

*Greg T. Schubert (Stephen W. Silverman* with him) for the
defendant.

*Kevin M. Flynn,* Assistant District Attorney, for the Com-
monwealth.

HENNESSEY, C.J.  The defendant was convicted of murder in the first degree by a Hampden County jury.  In this appeal the defendant asserts error in the trial judge's denial of the defendant's first motion for a mistrial (based upon news stories released during the trial which the defendant asserts deprived him of his right to a fair trial).  The defendant also asserts error in the judge's denial of his second motion for a mistrial (based upon the allegation that jurors had seen the defendant wearing handcuffs during a recess in the trial); in the judge's failure to charge the jury on manslaughter; and in the judge's denial of the defendant's motion for a new trial.  There was no error; we affirm.

The defendant was accused of fatally shooting Harry Evers at the victim's home in Westfield just before midnight on October 6, 1980.  The defendant had been hospitalized on October 5, 1980, due to an allegedly accidental knife wound. Rosiland Gwozda was visiting the other patient in the defendant's hospital room on October 6 (between 6 P.M and 8 P.M.). She testified that the defendant was highly agitated and was making telephone calls.  She testified that the defendant "slammed down the phone and he turned to me and he said, guess where she is, guess where she is?  He was very upset, very agitated.  I didn't know who she was or where she was. I said, I don't know.  He said, she's over his house, she's over his house."  According to the witness the defendant then made a telephone call to a man he addressed as "Harry."  "Then he said, Harry, when I get out of here, we have to talk about my wife.  What do you mean we will see?  What do you mean we will see?  Then he said, I'm going to get you, Harry, I'm going to get you."  Gwozda stated, "Then he was very, very upset.  The more phone calls he made the more upset he got." The defendant then left the hospital, without being medically discharged, clad in trousers, slippers, and a hospital "johnny."

Karl Slowick, an employer of the defendant, testified that he (Slowick) owned a shotgun (of a type that could have fired the fatal shot, according to a ballistics expert) but later discovered it missing.  Slowick testified that around 9 P.M. on October 6 he received a telephone call from the defendant.  The

defendant wanted to get some motorcycle parts. The defendant came to Slowick's house. They went out to the garage and got the parts. The parts were removed from a cabinet behind which the shotgun was allegedly stored. There were shotgun shells in the cabinet. The defendant had access to the garage on that evening and on other occasions.

About 11:30 P.M. that same evening, Gail Aiken was at home watching television when her dog started to bark. Aiken went to the window and looked across the street. She saw a man walking with a long gun in his hand. The gun was not "broke." Street lights illuminated the area. The man was walking toward a gravel pit (through which, according to another witness, Evers's backyard can be reached). Aiken watched the man walk for twenty-five to thirty feet and then lost sight of him. A shotgun blast was heard approximately fifteen minutes later by Patricia Prouty, who was Evers's next door neighbor. She thought the shot came from the vicinity of her backyard. When she looked out a rear window toward Evers's house, Prouty noticed that there were lights on in a bedroom and the kitchen. Prouty called the police. Police officers arrived and searched the yard and woods behind Prouty's house, but found nothing.

Sometime between midnight and 2 A.M. the defendant telephoned Slowick at home. Slowick was awakened from his sleep. The defendant said, "I blew the f_ _ _ head on the motorcycle . . . but you know, everything is going to be all right." Slowick hung up on the defendant. About 8:30 A.M. the defendant telephoned Slowick at work. He said he wanted to speak to Slowick. Slowick told him to pick up two cups of coffee and come to the shop. The defendant told Slowick that he "took care" of Harry, "He just said, he had, you know, blown his f_ _ _ head off."

The body of the victim was discovered by police about 10 A.M. on October 7. The cause of death was determined to be a single gunshot wound to the head. Police officers went to Slowick's house about a week after the murder. Slowick took the police to where the gun case was stored in his garage. The gun was missing and there were only wooden sticks in the

case. Slowick had discovered this only a short time before the police arrived. Slowick did not know what happened to the gun. The last time he had seen it was in the spring of 1980.

1. *The First Motion for a Mistrial.*

We summarize the facts, as found by the judge, as to the defendant's first motion for a mistrial. Empanelling of the jury commenced on Monday, May 4, 1981, and was completed on Wednesday, May 6, 1981. The jury was not sequestered.

On May 7, 1981, about 9 A.M., the judge was advised by counsel as to an item which appeared in the morning edition of the Springfield Union, a local daily newspaper. The judge read the article. There is no dispute that the content of the news story, including information about a prior and unrelated murder of which the defendant was accused but never convicted, raised a serious question of possible prejudice to the defendant. Defense counsel moved for a mistrial.

The judge then held a voir dire of each juror individually to see whether anyone had seen or read the article. The judge told each lawyer in advance what questions were to be asked, and asked for further suggestions. The lawyers agreed that the questions suggested by the judge were satisfactory. The judge advised them that there would be an opportunity to suggest further questions to the judge after he had questioned each juror.

The judge asked each juror whether he or she had read the Springfield Union that morning; whether he or she read any paper; whether he or she subscribed to the Springfield Union. Two jurors said they had read the headline but nothing further when they realized it pertained to this case. Neither could remember the exact headline or any details of the headline. None of the remaining jurors had read the article. Each of the jurors had taken an oath to tell the truth to any questions put to them before the individual voir dire during empanelling, and the lawyers agreed that the jurors were still under oath and did not have to be sworn in again on this second individual voir dire. The judge sequestered the jury for the rest of the trial, after ascertaining, by questions addressed to each of them, that no juror appeared disturbed, upset, or angry at the prospect of sequestration.

In denying the motion for a mistrial, the judge found that no juror had read the newspaper article and that the jury were not tainted by the article. There was no error. The judge complied, indeed it can be argued that he more than complied, with the procedures outlined by this court for such eventualities (see *Commonwealth* v. *Jackson,* 376 Mass. 790, 800-801 [1978]) and it is clear from his findings that he fully considered the issue whether there was a "high degree of necessity" for a mistrial. See *Sullivan* v. *Commonwealth,* 383 Mass. 410, 413-414 (1981). His denial of the motion was fully supported by his subsidiary findings, and by the evidence he heard upon the issue of mistrial. He was also warranted in concluding, as he did, that the defendant would not be tried by an "angry" jury. See *Commonwealth* v. *Reinstein,* 381 Mass. 555, 559 (1980).

2. *The Second Motion for a Mistrial.*

The defendant assigns as error the failure of the judge to "declare a mistrial after some of the jurors observed the appellant in custody, while shackled." There was no error.

We summarize the facts from the judge's findings. At approximately 4:20 P.M., Friday, May 8, 1981, when the sequestered jury were walking down the corridor to the elevator, a custodian apparently opened the door to the lockup room as the jury approached the door. The court officer leading the jury told the custodian to close the door and he did, but the defense claim was that some of the jurors saw the defendant standing handcuffed to a fellow prisoner waiting for the elevator. The defense moved for a mistrial. The judge inquired of the defendant and the court officers, and viewed the scene of the incident, accompanied by counsel and officers. Counsel were given the privilege of questioning the officers.

It was agreed by both sides that the judge would ask each juror whether he or she had seen the defendant in any other place than the courtroom since he or she was selected as a juror. If the lawyers wished further questions, the judge agreed to listen to them.

The judge then proceeded to ask each juror whether he or she had seen the defendant in any location other than the

courtroom since becoming a juror. The jurors, after they were questioned, were separated from the jurors waiting to be questioned. Fifteen answered "no." Counsel did not ask for further questions as to these jurors. One juror said "yes," that he had seen the defendant in a location other than the courtroom. The judge asked him where. He said he saw the defendant standing in a room. The juror was asked what he saw, and he said he recognized the defendant by the suit he was wearing. He did not say that he saw him shackled or in handcuffs. The judge asked whether he could recall where he was in line behind the court officer leading the jury. The juror said he was not sure, but he thought maybe four behind the lead court officer. The judge then asked if he was affected by anything he saw, and he answered "no." The judge asked him whether he could decide this case on the evidence and the law and on that alone, and the juror answered "yes." The judge asked him if he had told any other juror what he had seen, and he said "no." The juror was instructed not to discuss what he was asked or told, what he saw, what he said, or what was said during the questioning with any other juror during the remainder of the trial, and he said he would not.

The judge found, upon evidence which supported his findings, that fifteen of the sixteen jurors had not seen the defendant on the occasion at issue; that one juror had seen the defendant, but had not observed any handcuffs. The judge ruled that even if a juror accidently saw the defendant in handcuffs, a mistrial was not necessarily required, and further that there was no evidence that any juror had observed the defendant in handcuffs. The judge denied the motion for a mistrial. There was no error in the judge's denial of the motion, or in the reasoning or procedures followed by him pursuant to the motion. See. *Commonwealth* v. *Jackson, supra* at 800-801; *Commonwealth* v. *Brown,* 364 Mass. 471, 478-480 (1973).

3. *Motion for a New Trial.*

The defendant, after conviction, moved for a new trial, asserting that the witness Slowick had testified at the trial under the inducement of a "deal" with the office of the district attorney. After a hearing, the judge denied the motion. He

found that Slowick's testimony was vital to the Commonwealth's case. Slowick had testified before two grand juries. Before the earlier grand jury he had not testified as to any admissions by the defendant that the defendant had murdered Evers. He had testified to those admissions before the second grand jury, and at the trial. The defense relied, for evidence of a deal, upon the affidavits and oral testimony at the hearing on the motion for a new trial of one Noriyasu Kudo and one E. Terrance Ward.

There was no error in the judge's ruling. He found that the testimony of Kudo and Ward was not newly discovered evidence but was available and known to the defendant before trial. More importantly, the judge found that he did not believe the testimony of either witness as to the deal between Slowick and the prosecutor. The credibility of the witnesses Kudo and Ward was within the judge's province, and the ruling upon the motion for a new trial rested within his discretion. *Commonwealth* v. *Little,* 384 Mass. 262, 269 (1981). Cases relied upon by the defense are inapplicable, in light of the judge's conclusion that he disbelieved the witnesses.

4. *The Judge's Refusal to Charge the Jury on Manslaughter.*

The total evidence indicated that the victim was shot in the kitchen of his house, by a gun fired from outside, through a window of the house. No view of the evidence would warrant a verdict of manslaughter. See *Commonwealth* v. *Walden,* 380 Mass. 724, 727 (1980). Verbal insults and arguments cannot constitute sufficient provocation to establish a killing as manslaughter. *Commonwealth* v. *Estremera,* 383 Mass. 382, 391-392 (1981). *Commonwealth* v. *Bermudez,* 370 Mass. 438, 439-442 (1976). Although there were implications of adultery between the defendant's wife and the victim Evers, this case, considering the deliberate nature of the killing, does not approach the facts of *Commonwealth* v. *Schnopps,* 383 Mass. 178, 180-181 (1981), *S.C.,* 390 Mass. 722 (1984), and the narrow rule of that case.

5. *Review under G.L. c. 278, § 33E.*

In accordance with our duty, we have carefully reviewed the record and we conclude that the result reached was consonant with justice. Thus we leave the verdict undisturbed.

*Judgment affirmed.*