COMMONWEALTH *vs*. FREDERICK H. DUNKER, JR.

Suffolk.    September 9, 1986. — October 29, 1986.

Present: GREANEY, C.J., CUTTER, & DREBEN, JJ.

*Homicide. Malice. Practice, Criminal,* Instructions to jury, Presumptions
and burden of proof. *Constitutional Law,* Presumptions and burden of
proof. *Error,* Harmless.

At the trial of a first degree murder indictment in which the jury returned a
verdict of murder in the second degree, error, if any, in the judge's
instructions to the jury with respect to malice, by his use of the terms
"infer," "presumption," and "findings," was harmless beyond a reason-
able doubt where the charge adequately instructed the jury on all degrees
of homicide, including manslaughter; where, at best, there was slight
evidence to have required a charge on manslaughter; and where, since
the defendant relied on an alibi defense, malice was not a contested
issue at trial. [69-75]

INDICTMENT found and returned in the Superior Court on
September 14, 1970.

Following the decision of the Supreme Judicial Court re-
ported in 363 Mass. 792 (1973), a motion for a new trial filed
in the Superior Court on June 11, 1985, was heard by *James
D. McDaniel, Jr.,* J.

*Virginia Lee* for the defendant.

*Daniel P. Napolitano,* Assistant District Attorney, for the
Commonwealth.

CUTTER, J. Dunker appeals from the denial by a Superior
Court judge (the motion judge) of Dunker's fourth motion for
a new trial of the indictment resulting in his conviction on
April 29, 1971, of murder (on June 29, 1970)[1] in the second

---

[1] The shooting for which Dunker was indicted took place on June 25,
1970. Crowley, the victim, died on the 29th.

degree of Alfred J. Crowley. On an earlier appeal, the convic-
tion was affirmed by the Supreme Judicial Court. *Common-
wealth* v. *Dunker,* 363 Mass. 792 (1973). Dunker asserts, as
a basis for his present motion for a new trial, that the judge's
instructions on malice and manslaughter at the original trial
(a) "created an impermissible mandatory presumption in viola-
tion of . . . [Dunker's] rights to due process of law," and (b)
"improperly shifted to . . . [Dunker] the burden of proving
that he acted in passion or heat of blood and that his conduct
was wanton and reckless." At the 1971 trial no objection or
exception was claimed to the pertinent portions of the charge.
The original trial took place before the decisions in *Mullaney*
v. *Wilbur,* 421 U.S. 684 (1975), and *Sandstrom* v. *Montana,*
442 U.S. 510 (1979).

The motion judge, in a 1985 memorandum decision denying
a new trial, reviewed the general facts established at the 1971
trial, and concluded that Dunker's "defense consisted solely
of [an] alibi," viz., that he had been in New Bedford on the
early morning of June 25, 1970, when Crowley was shot in
Dorchester, and stated in a footnote to his memorandum that
"[a]t one point counsel for . . . Dunker indicated that he
intended to present evidence that . . . [Dunker] acted in self
defense" but that "[n]o such evidence, in fact, however, was
offered at trial." The motion for a new trial was denied on the
ground that any error in the judge's charge on malice was
harmless because "the heart of . . . [Dunker's] defense . . .
was alibi" and that Dunker "never . . . advanced any theory
of justification, mitigation[,] or lack of intent nor . . . were
these issues raised by the evidence." The consequence, in the
opinion of the motion judge, was that Dunker had "waived the
issue of . . . errors in the charge[2] on malice in light of his
strategy of an alibi defense." The motion judge thus concluded
that, if all of the defense founded on the evidence was an alibi,
the "charge on malice was unrelated to the issues in the case
[and in fact tried] and was harmless beyond a reasonable
doubt."

---

[2] Based on the *Sandstrom* case, 442 U.S. at 514-527.

The motion judge (who was not the trial judge) was advised by counsel (for the Commonwealth and for Dunker), at the hearing on the motion for a new trial, that the only evidence at trial bearing upon any defense other than alibi, was from a police officer who had talked with the victim and from two prisoners with whom Dunker had talked at M.C.I., Bridgewater, while there for pretrial examination.[3]

The evidence against Dunker at the 1971 trial came from four principal witnesses. Two were police officers who talked with the victim at Boston City Hospital shortly after he was shot. The admission of the victim's statements to these officers that Dunker had shot him was sustained, on the ground that they constituted dying declarations, in the 1973 opinion of the Supreme Judicial Court, 363 Mass. at 793-795. The two prisoners who in 1970 had been in protective confinement at M.C.I., Bridgewater, testified to admissions made there to them by Dunker.

One of these prisoners (Francis Garney) testified that Dunker told him that he (Dunker) "and another fellow called Big Mack . . . stole a Chrysler . . ., brought it . . . to Boston with the intentions to pick up and kill . . . Crowley. They drove . . . to the 1310 Lounge at around one o'clock in the morning . . . and Big Mack went into the 1310 Lounge on Dorchester Avenue and he picked up . . . Crowley and took him out with the intentions [*sic*] to kill him." Garney's testimony continued. "[T]hey drove around Dorchester . . . into the Fields Corner area and *where an argument took place in the car* and . . .

---

[3] The evidence relevant to defenses other than alibi was identified to the motion judge by pages of the original trial transcript. Copies of these trial transcript pages were received as an exhibit at the motion hearing. Dunker's present counsel stated that she concurred with the prosecutor "concerning the evidence [other than alibi, and] that the three witnesses that he provided . . . the two prisoners and the police officer, are also the same . . . [such] evidence that . . . [she herself] had found." The exhibits at the motion hearing have not been supplied to us, but the original trial transcript has been obtained. The whole testimony at trial of the witnesses mentioned by counsel has been examined in the preparation of this opinion. The testimony at trial of witnesses referred to in the 1973 opinion of the Supreme Judicial Court, 363 Mass. at 798-800 has also been studied.

Dunker asked Big Mack for the gun, while he was sitting in the back seat with . . . Crowley. And he shot . . . Crowley in the left side of the face and the kid . . . ran out of the door of the car . . . and he [Dunker] shot him again in the side" (emphasis supplied). Garney further testified Dunker had said that "Big Mack was driving the car," that they then drove to South Boston, and that Dunker "took Big Mack's car and drove to New Bedford." This, Dunker told Garney, was "to set up an alibi . . . if he got arrested." On cross-examination by Dunker's counsel, further inquiry about the "argument" in the automobile was made. The witness, Garney, persisted in his testimony that Dunker told him that, during or after the "argument," he [Dunker] had asked Big Mack in the front seat for a gun and had been passed one. Before that Dunker didn't have a gun.

The other prisoner at M.C.I., Bridgewater, who testified that he talked with Dunker in 1970 was Carlos A. Wilson. His pertinent testimony is summarized in the margin.[4]

At the hearing before the motion judge, the testimony at trial of Sergeant Francis Whalen was referred to as possibly providing some support for a defense other than alibi. Sergeant Whalen had testified to talking three times with Crowley, the victim, at the hospital prior to his death. Crowley told him that Fred Dunker had shot him, that he (Crowley) did not know where Dunker lived, that he did not know the reason why the shooting happened, and that they (Crowley and Dunker) had served time together at M.C.I., Concord. On cross-examina-

---

[4] Wilson testified that he knew Garney. He heard Dunker say to Garney "that he [Dunker] had eight witnesses . . . in New Bedford that were going to verify that he was with them . . . during the time of the killing." His testimony concerning Dunker's account to Garney and to him was that, after Big Mack and Crowley came out of the 1310 Lounge, "they got into the car," which Big Mack "was driving". Dunker said that "he was sitting behind him and that Crowley was sitting on his right. He said they drove around for a while and some kind of an argument came up between him and Crowley . . . and finally he [Dunker] said to Mack, 'Let me see the gun.' Mack handed him the gun and at the time Crowley was trying to get out. He said he got him, shot him twice," viz., in the head and also in the side. Wilson also testified that he did not know Crowley, the victim, but had met Dunker in 1962.

tion, Sergeant Whalen testified that Crowley had said that, while he was in the back seat of a vehicle, sitting next to a man from South Boston named Mack "he was shot . . . and then jumped out the door and ran . . . about 28 feet." The victim told the sergeant that the victim did not know whether "Mack" was a first name, a nickname, or a last name. Crowley also told the sergeant that he "had an argument with" Dunker in the car.

The only other evidence which might have a bearing on any defense other than alibi was that referred to in the 1973 opinion of the Supreme Judicial Court, 363 Mass. at 798-800. There it was recited that defense counsel had asked Crowley's father whether Crowley would get upset if someone was seeing Crowley's former wife and whether Crowley was easily excitable. As the 1973 opinion states (at 798), counsel in a bench conference had told the trial judge that the inquiry was material because "our defense here is going to be self defense." The opinion went on (at 799), "Based on that representation, the judge allowed . . . evidence concerning the victim. . . . [T]he victim's father testified that, except on occasion, the victim had not been living with his wife for four years prior to his death; he could not be the judge of whether the victim disliked his wife; he had trouble with his son; and his son was quick tempered. When the witness testified that he did not know whether his son 'would take offense . . . at anybody who was stepping out or having any affair with his wife,' the judge asked counsel in front of the jury whether he was 'going to have evidence of that.' Counsel replied, 'Yes, I am, definitely.' *No such evidence was ever introduced*" (emphasis supplied).[5]

The evidence just summarized is the only evidence brought to the motion judge's, and to our, attention as constituting

_____

[5] In the 1973 opinion (at 799-800), it was recognized that defense counsel had made an "apparent switch in . . . tactics" and that it was permissible for the prosecutor to comment upon the defense trial tactics. The 1973 opinion (at 800) also made the comment, "Indeed, the evidence . . . concerning the character of the victim and the occurrence of an argument between the victim and . . . [Dunker] may have been the evidence which prompted the jury to find . . . [Dunker] guilty of second, and not first, degree murder."

evidence (a) permitting or requiring the trial judge to charge on manslaughter, or (b) constituting a basis for Dunker to argue a defense other than alibi. After the Commonwealth rested its case in chief, there was no defense effort to establish anything other than that Dunker was in New Bedford when Crowley was shot. Indeed, Dunker himself took the stand and testified that he was not in the Boston area "between the morning of June 24 and the noon of June 25, 1970," and described in detail what he claimed to have been doing in New Bedford during that period.

Dunker's present counsel now contends that the judge's instructions at the 1971 trial concerning malice created an impermissible mandatory presumption of malice which deprived Dunker of due process of law under principles discussed in the *Mullaney* case, 421 U.S. at 694-704, the *Sandstrom* case, 442 U.S. at 514-527, and *Francis* v. *Franklin,* 471 U.S. 307 (1985). See also *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-692 (1976). Defense counsel also contends that these decisions are retroactive to convictions obtained and affirmed prior to their rendition. See *Hankerson* v. *North Carolina,* 432 U.S. 233, 240-244 (1977).

The charge given by the trial judge must be viewed as a whole. See *Commonwealth* v. *Sellon,* 380 Mass. 220, 231-232 (1980). The judge, at the outset, gave appropriate instructions on the presumption of innocence and that Dunker "does not have to prove that he is innocent." The judge also instructed that it is "the obligation of the Commonwealth to establish beyond a reasonable doubt every essential element of the crime." In discussing specific intent, he told the jury, "An intent to kill may be *inferred* from the act of killing where a loaded firearm held by a defendant is aimed at a person and is discharged; the jury have a right to *infer* that such defendant intended to discharge it and to cause the bullet to hit a person at whom the firearm was aimed" (emphasis supplied). The trial judge gave adequate instructions on the whole spectrum of homicides: murder in the first degree, second degree murder, voluntary and involuntary manslaughter, and on the sometimes included offense of assault and battery. He distinguished murder from manslaughter by "the absence of malice in manslaughter".

The judge also instructed on the relationship between (a) malice, and (b) the use of a firearm which caused a homicide, in language set out in the margin.[6] Dunker's present attorney argues that some of this language tends to shift to Dunker the Commonwealth's burden of establishing all the elements of murder in the second degree, in large part because of the use of the word "presumption" in the language immediately following the bracketed letters [X] and [Y] in n.6. With this language, however, there must be read the trial judge's instructions with respect to manslaughter in this particular case.[7]

---

[6] These instructions read, in part: "If a man intentionally and without legal justification . . . uses upon the body of another a force; for example, if a person puts a bullet in a revolver . . . that as used would probably do grievous bodily harm to another and create a plain and strong likelihood that the other will die as a result, the act is malicious within the meaning of the law even though the doer of that act was indifferent as to whether death would result or wished or hoped that death would not result. And an unlawful killing may be with malice aforethought and consequently murder in some cases where there was no intention to endanger life or even to injure. . . . Now, malice can be active malice, actual malice, or malice which is implied in law. And it is implied in law if there is an unlawful unjustified killing." After giving various illustrations of active malice, the judge proceeded, "You are also looking for an unlawful, unjustified act with no extenuating circumstances. And the heinousness, the wrongfulness of the act itself is sufficient to sustain a finding of malice . . . as far as the law is concerned. [X] *Our court has said that from the use of a deadly weapon or instrument, there arises the presumption of malice aforethought,* as that term has been understood and applied in this Commonwealth. *So if you find an unlawful, wrongful, unjustified act such as killing, the commission of the act itself supplies, as a matter of law, the malice contemplated by the statute* when it talks about malice aforethought. . . . [Y] *[T]he circumstances which attend the killing may be shown, however, to rebut the presumption of malice* . . . by showing circumstances that[,] although they don't justify the killing, they do mitigate it from murder to manslaughter." (Emphasis supplied.)

[7] After defining voluntary manslaughter as killing "without malice but in sudden passion or heat of blood caused by reasonable provocation or upon sudden combat," he referred to the evidence that a "fight" took "place between . . . [Crowley] and . . . [Dunker] in the car. You are entitled to draw inferences within the limits I have explained. So, if you find the circumstances which support an intentional but unlawful killing by reason of passion or heat of blood, if you find those elements, those sustain the crime of manslaughter; they reduce the unlawful killing from murder to manslaughter because malice isn't present. Malice isn't present there because

At the close of the charge, after a bench conference, the judge gave his final instructions: "It is not sufficient to sustain a conviction of murder that the defendant may have been guilty of some other crime or crimes or that he may have been guilty of generally bad or imprudent conduct. . . . *The proof must establish the guilt of the defendant beyond a reasonable doubt of every essential element of the particular charge made in the indictment.* . . . You must find the evidence to sustain the essential elements of either voluntary or involuntary manslaughter as I have explained them or don't find manslaughter. . . . [I]n the event you don't find *beyond a reasonable doubt the essential elements of any of the crimes* which I have defined, of course he is entitled to a not guilty to everything" (emphasis supplied).

There was little evidence to require that the trial judge charge on manslaughter, even if Dunker had admitted that he had shot Crowley. An autopsy revealed that a bullet had gone through the victim's head and that there was a bullet wound also in his side. This showing of accurate markmanship in close quarters at least tended to negate accidental shooting. The evidence of any physical argument or fight in the automobile was slight, at best. No evidence of provocation by Dunker by any inappropriate conduct with the victim's former wife ever was presented. The general testimony of Crowley's father that he had trouble with his son and that the son was quick tempered had no specific relation to the circumstances in which the son was killed. It may well be that the trial judge merely gave the manslaughter charge out of abundance of caution. See *Commonwealth* v. *Vanderpool,* 367 Mass. 743, 746 (1975); *Commonwealth* v. *Estremera,* 383 Mass. 382, 391-393 (1981);

the heat and the passion of the body took over. . . ." The judge defined involuntary manslaughter as a homicide where there is no intent to kill but where the homicide was caused by "such a disregard of probable harmful consequences as to constitute wanton and reckless conduct." He proceeded, "[I]f you believe there was a fight in that automobile, I suppose it is perfectly possible for you to find that a gun was accidently discharged. And if it was accidentally discharged in the course of wanton and reckless conduct while they were fighting with no inténtion to kill, it fits the category of involuntary manslaughter."

*Commonwealth* v. *Dustin,* 391 Mass. 481, 487, cert. denied, 469 U.S. 844 (1984). See also *Commonwealth* v. *Walden,* 380 Mass. 724, 727 (1980); *Commonwealth* v. *Lee,* 383 Mass. 507, 514 (1981).

Viewed as a whole, the judge's charge (as mentioned above) gave full instructions on the presumption of Dunker's innocence and on the continuing burden resting upon the Commonwealth to prove every element of the crime with which Dunker was charged. The inadequacies now asserted, understandably, were not argued at all in 1973 (upon the original pre-*Mullaney* case appeal, 363 Mass. 792) and nothing about any improprieties in the jury charge then was discussed by the court, despite the comprehensive review (see, at 800) required by G. L. c. 278, § 33E. Even in the present post-*Mullaney* and post-*Sandstrom* era, however, the charge reasonably can be viewed as not risking interpretations by a jury prescribing any mandatory presumption, in view of (a) the broad flexibility described to the jury by the trial judge concerning their power to find the facts and (b) his repeated instructions that to convict they must be convinced beyond a reasonable doubt of each element of a crime charged. See *Commonwealth* v. *Adrey,* 397 Mass. 751, 753-755 (1986), and cases cited at 755. Particularly should this view prevail upon the possibly more lenient scrutiny to be afforded to jury instructions given prior to the *Mullaney* and *Sandstrom* decisions. See *Commonwealth* v. *Collins,* 374 Mass. 596, 599 pars. (1) & (5) (1978).

We recognize, of course, that use of the terms "presumption" and "findings" (with reference to the proof of malice) have been disapproved as recently as *Commonwealth* v. *Nieves,* 394 Mass. 355, 361 (1985), which reached a conclusion different from that in the *Adrey* case. In the present case, however, the situation was greatly affected by the circumstances that Dunker shifted to an alibi defense after the Commonwealth rested its case-in-chief.

*Commonwealth* v. *Festa,* 388 Mass. 513, 514-516 (1983), dealt with a conviction in October, 1974, of murder (on January 27, 1974) in the second degree. See *Commonwealth* v. *Festa,* 369 Mass. 419, 420, 424 (1976). The trial judge had charged (see 388 Mass. at 514) that "[w]hen the killing is caused by the

intentional use of a deadly weapon there arises a presumption of malice." This had been accompanied by an instruction that the jurors could "infer malice from the use of a deadly weapon, such as a revolver." The 1983 opinion (at 515) concluded that the charge "did not impose on [Festa] the duty to disprove malice" and further that "Festa's case was tried and argued by both parties solely on the issue of the identity of the perpetrator" of the homicide. Festa's renewed motion for a new trial was denied (on this phase of the case) because the "use of the word 'presumption' in the malice instructions [has] no bearing on [Festa's] guilt, and . . . the instructions [do] not create a danger of grave prejudice or a substantial likelihood of a miscarriage of justice." *Ibid.,* citing *Commonwealth* v. *Pisa,* 384 Mass. 362, 363-364 (1981). See also *Commonwealth* v. *Lee,* 383 Mass. at 512-513, where Lee presented an alibi defense (see, at 509) with the consequence (at 512) that "[t]he propriety of the charge as to malice was not in issue. The case was tried and argued by both parties on the theory that a murder had been committed. The issue contested by . . . [Lee] was solely that of the identity of the murderer." [8]

---

[8] The *Lee* opinion (at 512-513) also says: The "failure to object [to the charge as to malice] reflects a conscious choice of trial strategy by defense counsel. We think our language in *Commonwealth* v. *Johnson,* 374 Mass. 453, 465 (1978), disposes of the defendant's claim of error: 'We look askance when counsel who has tried a case, without success, . . . on one theory of law, then attempts to obtain appellate review on an entirely different theory. . . . Neither the conventional type of appellate review permitted in a criminal case, nor . . . G. L. c. 278 § 33E, for "capital case[s]," is intended to afford an opportunity, from the vantage point of hindsight, . . . *to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge'* " (emphasis supplied). The opinion (at 513) then said, "The evidence here raised no issue of justification, mitigation, or lack of intent on the part of the perpetrator. Rather, the identity of the killer was the paramount consideration. This case is thus factually distinguishable from those in which malice is a pivotal element in the jury's deliberation." The opinion then referred to the *Sandstrom* case, 442 U.S. at 520-521, *Commonwealth* v. *Repoza,* 382 Mass. 119, 134-135 (1980), *Reddick* v. *Commonwealth,* 381 Mass. 398, 404-405 (1980), and *Commonwealth* v. *McInerney,* 373 Mass. 136, 141 (1977), where intent remained a principal issue. We are aware, of course, that, in the present case, the slight evidence of an argument in the automobile, obtained on cross-examination during the Commonwealth's affirmative

A more recent case, *Commonwealth* v. *Egerton,* 396 Mass. 499, 505 & n.4 (1986), is relevant. There the *Lee* case was referred to as presenting an analogy to the refusal of a trial judge to charge on a lesser included offense where there was little or no evidence or defense contention based "on the element differentiating the greater and lesser offenses" and (at 504) the "defense was primarily one of alibi." See also generally *Commonwealth* v. *Estremera,* 383 Mass. at 393-396; *Commonwealth* v. *Doucette,* 391 Mass. 443, 450-454 (1984).

The *Estremera, Lee, Festa,* and *Egerton* cases, in some degree, involve the appraisal of a jury charge on malice or intent in instances where other issues were predominantly the areas of contest at trial. This predominance of other issues has been treated as an important aspect of the context in which the probable impact on the jury of the malice charge has been determined. We are of opinion that the motion judge correctly concluded that, because of Dunker's alibi defense, any error in the 1971 malice charge was at most harmless. Viewing the evidence in the present case as a whole, we perceive no significant risk of any miscarriage of justice in the motion judge's decision. His conclusion that Dunker's assertion of an alibi defense was a waiver of any *Sandstrom* type error in the malice charge finds support in language in *Commonwealth* v. *White,* 392 Mass. 282, 286 (1984). See also *Commonwealth* v. *Pisa,* 384 Mass. 362, 363-364 (1981); *Commonwealth* v. *Tameleo,* 384 Mass. 368, 369-370 (1981).

There has been doubt expressed in recent decisions of the Supreme Court of the United States whether it was ever appropriate to regard any error as harmless where there was conceivably constitutional error of the type discussed in the *Sandstrom* case. See, e.g., *Connecticut* v. *Johnson,* 460 U.S. 73, 87 (1983, where possible instances of "harmless error" were discussed but not found there to exist by a majority of the Court). In *Francis* v. *Franklin,* 471 U.S. 307, 313-327 (1985),

---

case, was never abandoned at trial in any formal way, although thereafter it ceased to be advanced by Dunker. To this extent this case may differ from the facts in the *Festa* case.

the issue was recognized as left unsettled. See also the dissents at 327-342. The question seems to have been answered in a recent split decision, *Rose* v. *Clark*, 478 U.S. 570, 576-584 (1986). The *Rose* case was remanded (at 584) to the United States Court of Appeals with directions to consider "whether the error committed . . . was harmless beyond a reasonable doubt." The case, for the present at least, decides that the "harmless error" principle of *Chapman* v. *California*, 386 U.S. 18 (1967), may be applied in a *Sandstrom* context. See *United States* v. *Hastings*, 461 U.S. 499, 507-512 (1983). As in that case "[o]n the whole record, we are satisfied beyond a reasonable doubt that the error [if any, now] relied upon was harmless." *Id*. at 512.

*Order denying motion for new*
*trial affirmed.*