**Rawlinson ALVES, Petitioner,**

v.

**James MATESANZ, Respondent.**

**No. CIV. A. 97–11015–JLT.**

United States District Court,
D. Massachusetts.

July 20, 2000.

Rawlinson Alves, Bay State Correctional Center, Norfolk, MA, pro se.

Gregory I. Massing, L. Scott Harshbarger, Attorney General's Office, Catherine E. Sullivan, Assistant Attorney General, Criminal Bureau, Boston, MA, for respondent.

## ORDER

TAURO, District Judge.

The court hereby orders as follows:

(1) The Report and Recommendation on Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (# 1) is hereby ADOPTED; and

(2) Petitioner's Writ of Habeas Corpus by a Person in State Custody is DENIED.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION ON PETITION UNDER § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY (# 1)

COLLINGS, Chief United States Magistrate Judge.

### I. Introduction

Presently before the Court is petitioner's request for a writ of habeas corpus. Petitioner Rawlinson Alves ("Alves") is serving a life sentence[1] after being con-

---

1. Under Massachusetts law, Alves will be eligible for parole after he has served a minimum of fifteen years of his life sentence. *See* Mass. Gen. Laws ch. 127, § 133A.

victed in Massachusetts state court of second degree murder. His conviction was affirmed by the Massachusetts Appeals Court, *Commonwealth v. Alves*, 35 Mass. App.Ct. 935, 937, 625 N.E.2d 559, 561 (1993); the Supreme Judicial Court denied further appellate review of the conviction.

Alves then filed this petition for a writ of habeas corpus,[2] asserting that his trial counsel provided ineffective assistance, *see Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); thus, he contends he is being confined in violation of his right to counsel under the Sixth Amendment. More specifically, Alves contends his counsel rendered ineffective assistance by failing to object to an instruction given by the judge which allegedly imposed a mandatory presumption in the Commonwealth's favor on the element of intent, a crucial issue at trial. He argues that the instruction violated his Constitutional right (under the Due Process Clause) to be convicted only upon proof by the Commonwealth beyond a reasonable doubt of every element of the offense in question. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

For the reasons stated herein, I recommend that the request for a writ of habeas corpus be denied.

## II. Statement of Facts

### A. Background

Late in the evening of August 13, 1989, Alves inflicted a single stab wound upon Angela Ribeiro ("Angela"), his girlfriend of many years. Later that same evening, Angela died of her injury. Alves was charged and was convicted of second degree murder in her death. Alves has never disputed that he was the one who inflicted the fatal stab wound. His only contention at trial was that he did not act with the requisite malice to be guilty of

second degree murder under Massachusetts law.

### 1. The Three Participants

Nearly six months before Angela's death, in February 1989, Alves had come to this country from his native Brazil. Tr., Vol. V at p. 41. He had been a law student in Brazil, but Angela had come to this country in January 1989, and he followed her here. *Id.* at 47. The two had dated for a number of years, and Alves testified that after Angela arrived here, they agreed that Alves should come here, too. *Id.* at 48–49. At some point after his arrival, the two began to share an apartment at 9 Proctor Street in Peabody. *Id.* at 52. Both obtained employment in the surrounding area and worked long hours at multiple jobs.[3] Tr., Vol. V. at 57.

In June 1989, Angela's sister, Ana Ribeiro ("Ana"), came to this country from Brazil and moved into the apartment on Proctor Street with Alves and Angela. *Id.* at 54. Angela and Ana began sharing a bedroom in the apartment; Angela slept on a twin bed, and Ana slept on some blankets on the floor. At some point after Ana's arrival, Alves claims that tension developed between Alves and Ana. He felt that she was interfering in his relationship with Angela and that Ana had convinced Angela to leave him. *Id.* at 59–62. Ana denied there was any tension between her and Alves, though she did concede that she was opposed to her sister's relationship with Alves. Tr., Vol. IV at 40.

### 2. The Stabbing

On the evening of August 13, 1989, Angela and Ana returned to the apartment on Proctor Street at approximately 9:30 p.m., after having spent the evening with friends. Tr., Vol. V at 64. Alves was at the apartment when they arrived. Alves

---

**2.** In a previous opinion by Chief Judge Tauro of this Court, the petition was found to have been timely filed under the Anti–Terrorism and Effective Death Penalty Act. *See Alves v. Matesanz*, 20 F.Supp.2d 135 ((D.Mass., 1998).

**3.** Alves testified that he usually worked two full-time jobs, averaging a total of 80 hours per week, and that Angela typically worked 50 to 55 hours per week. Tr., Vol. V at 57.

attempted to talk to Angela about recent difficulties they had had in their relationship, but Angela said she would not talk with him at that time. Tr., Vol. V at 65; Tr., Vol. III at p. 34. Angela walked into the bathroom, followed by Ana, then went to the bedroom, again followed by Ana. Tr., Vol. V at 65–67; Tr., Vol. III at 34–35. Alves attempted to speak to Angela through the locked bedroom door, but she continued to refuse to talk to him; he then went to the kitchen. Tr., Vol. V at 67–68.

Alves testified that at that point he was despondent over his relationship with Angela and with his perception that Ana had interfered in that relationship. He went to the kitchen and wrote a letter to his family in Brazil. He claims the letter was a suicide note. *Id.* at 68–69. It read as follows: [4]

Hi, my father, my mother and my brothers. I know that at this moment you are very shocked with me for being so weak, and never turned out to be the man that you, my father, hoped I would be. This is the only way I found to say goodbye to you, whom I have not seen personally for about six months because I lacked the courage to say goodbye by the telephone. ·

You know, Father, all this is for love. It is love. I love this woman, but she is making a clown, a fool, a black boy with me, and I do not accept this. And I could never accept because I am the son of a man of whom I have a lot of pride. I have a favor to ask from you, my father, regarding my coming to the USA. It cost me eight thousand dollars. And unfortunately, up to now, I only paid three thousand dollars. And honestly, I would like people to remember me, but never as a bad payer. I have not forgotten you, lady, my mother, because you are the most wonderful person that I know, the most beautiful, most caring mother. And everything else that a son could expect of a mother, and for all this, I love you, too.

You (Marlucia), my second mother, at this moment you are upset with me, it is not it. I would like to possess the strength that you do possess, because to me you are incredible. At this moment I have no words to express how important you have been to me. Sincerely forgive.

You Marlene, whose way of looking at life I do not agree with, but nevertheless, I cannot stop myself from admiring your strength and your courage to fight for what you want, and please, when Marimha grows up, do not let her learn about this weak uncle she had. (Ralson, Ramilson and Wilson) Do not disappoint my father like I did. Be aware that I · love you, too and want you to find a woman that does not make you suffer, because this one is insupportable. Look, people, I have two weeks pay to receive at (Lane) which is worth about four hundred dollars. And I also have two weeks pay to receive ( ), which is four hundred and fifty dollars. Please take this money and deposit it into a savings account under the name of Ana _____ of (Marinha). Such money to be used toward the scholastic education of the two sweeties that I love so much. The only thing that I have left is to ask God for forgiveness and to wish you that your lives proceed in peace and with the protection of the Holy Lord. Goodbye.

Tr., Vol. V at 79–81.

After writing the letter, he called out for Angela, and she went to the kitchen and had a conversation with Alves. Tr., Vol. VI at p. 9. Alves' testimony regarding that conversation was as follows:

A: I asked her what was happening. I told her that if we would continue to live that way, that I'd prefer to die.

Q: And did she say anything to you?

A: She said not to do that because my mother loved me very much.

---

**4.** The letter was written in Alves' native language of Portugese. A translation of the let- ter was introduced at trial and the parties stipulated to its accuracy.

Q: And when you were talking to Angela, what was your condition?

\* \* \* \* \* \*

A: I was crying.

Q: And when Angela told you that you loved your mother too much, how did she say that?

A: She just said, don't do that because you love your mother too much, and then she returned to the room.

Tr., Vol. VI at 9–10.

Ana also testified that as Angela was returning to the bedroom, Ana heard Angela say to Alves, "[D]on't you have any love for your mother. Think of your mother." Tr., Vol. III at 41.

Angela returned to the bedroom and locked the door. *Id.* Alves testified that at that point he attempted to commit suicide with a kitchen knife.

Q: And after Angela went back to her room, what did you do?

A: I took the knife.

Q: Where did you take the knife from?

A: There's a place in the kitchen where we keep all the utensils.

Q: And what did you do?

A: I took a stone ... and then I sharpened the knife. I just passed it several times.

Q: What did you then do?

A: I was trying to—I tried to put the knife against the wall and I was trying to go forward on that knife.

Q: Were you successful at any point, or any attempt?

A: No. It hurt too much, so I put the knife on the floor.

Q: Did you cut yourself?

A: No, I did not.

Q: Did you scratch yourself with the knife?

A: No.

Q: How much time would you say you were in the kitchen alone trying to commit suicide?

A: Ten or fifteen minutes. I'm not sure.

Q: And how many times did you try to commit suicide?

A: Twice.

Q: And at some point did you stop trying to commit suicide?

A: Yes.

Q: And why did you stop?

A: I knew it was wrong. I had a family and we also were very religious.

Tr., Vol. VI at 10–11.

Alves testified that he then made further attempts to speak to Angela. He says he called to her twice, and after the second time Ana told him to go to bed. *Id.* at 12. He says he then began banging on the bedroom door and threatening to "tear it down" if they would not open it. Tr., Vol. VI at 12. Ana opened the door slightly and told him to stop making noise. *Id.* He pushed past her and entered the room. *Id.* at 12–13.

Alves claims the following exchange then occurred:

A: I said, for the love of God, tell me what is happening.

\* \* \* \* \* \*

Q: Did she [Angela] say anything to you?

A: She didn't say anything. Ana Claudia told me at that point that Angela had already made her decision [to leave Alves] and everything was happening very quickly.

Q: When Ana Claudia said this to you, did you have any conversation with Ana Claudia?

A: I turned toward Ana Claudia and told her, for the love of God, just stop interfering with our lives. After she arrived to the United States she had become a problem.

Q: Did you have any further discussions with Ana Claudia at that point?

A: No. Angela was sitting and then she got up and told me to stop insulting her sister.

Q: What did you do?

A: I just pushed Angela and she fell on the bed.

Tr., Vol. VI at 13–14.

Ana's testimony differed from Alves' testimony significantly. Ana testified that as Alves stood outside the bedroom, he yelled, "Angela, you have decided not to live with me anymore. If you are not going to live with me, you will not live with anyone else." Tr., Vol. III at 42. She also testified that he banged on the door and threatened to "tear it down." *Id.* at 44. When he entered the room, he appeared to be "completely transformed." *Id.* at 46. She says Angela sat down on the bed when Alves entered. She further testified as follows:

A: He came in and stood next to her and said, Angela, you are my problem, you are my problem, you are my problem.

\* \* \* \* \* \*

He took about two steps and remained in front of her, and threw his cigarette on the floor, and said to her, I know I'm going to hell. I know I'm going to hell. And he hit her and she fell on the floor, and she fell on her side.

Q: Where did he hit her?

A: In her face.

Q: And when she fell on her side, did she fall onto the bed, or onto the floor?

\* \* \* \* \* \*

A: On the bed, on the side.

Tr., Vol. IV at 7, 9–10.

Alves and Ana both testified that the three then became involved in a physical struggle. Ana characterized the struggle as follows:

Q: When Mr. Alves struck your sister where were you standing?

A: I was near the door and I went toward him.

Q: What did you do when you went towards him?

A: I pushed him, I put my hand on his shoulders and pushed him towards the bed.

Q: Did he—where did he go when you pushed him?

A: He fell to the left of the bed.

\* \* \* \* \* \*

Q: When he fell onto the bed where were you?

A: I fell on top of him with my knee on the bed.

\* \* \* \* \* \*

Q: Miss Ribero, when you pushed Rawlinson Alves onto the bed, aside from the cigarette, had you seen anything in his hands?

A: No.

\* \* \* \* \* \*

Q: What did Rawlinson Alves do when he got on the bed?

A: He came towards me. I had my hands on his shoulder, and he was able to push the knife under my arm.

Q: Miss Ribero, could you see which hand he had the knife in?

A: The right hand. The right hand.

Q: Did you see where he had taken it from?

A: No.

Q: What did he do with the knife?

\* \* \* \* \* \*

A: He put it through the left of Angela, the left side of Angela.

\* \* \* \* \* \*

Q: ... [W]hen the knife went into your sister's side, what did your sister do?

A: `She started to run downstairs. She got up, started to run downstairs and started to yell, that man is crazy, that man is crazy, and asking for help.

Tr., Vol. IV at 10–12.

Alves characterized the struggle as follows:

Q: And after you pushed Angela and she fell on the bed, what happened?

A: I fell on the bed, also.

Q: And why did you fall on the bed?

A: Ana Claudia pushed me and she fell on top of me.

Q: How did she push you?

A: I was in a bad position and she just pushed me and I fell on the bed.

Q: Now, when you were knocking on the door, and when you were allowed into the bedroom, where was the knife?

A: It was in my belt.

Q: Did you take the knife out at any point while you were arguing with Ana Claudia?

A: The only thing I remember is when I fell on the bed and Ana Claudia fell on top of me, and she was yelling at me. I don't remember anything else after that.

Q: What was Ana Claudia yelling at you?

A: I really don't know.

Q: And how—what happened once Ana Claudia and you fell on top of each other in the bed?

A: She was yelling. I couldn't see anything and I lost complete control of myself.

Q: Do you know when you grabbed the knife?

A: No, I cannot—I don't know how to answer that question.

Q: Where was Angela when you and Ana Claudia were struggling in the bed?

A: She must have been on the bed, also, but after Angela—Ana Claudia pushed me and I pushed her back, the other one must have been there.

Q: You remember what you did with the knife when you and Angela, when Ana Claudia were struggling in the bed?

A: No, I don't.

Q: What was the next thing that you remember happening in that bed?

A: Angela yelled.

Q: And what happened?

A: Angela left running out of the apartment and I was still on the bed.

Tr., Vol. VI at 14–15.

### 3. The Aftermath

Ana testified that once Angela ran from the room, she told Alves to give her the knife, and he did so. Tr., Vol. IV at 11–12. She says that he then told Ana to "go after her because he had hurt her." *Id.* at 13.

Alves testified that he then went downstairs "to look after Angela." Tr., Vol. VI at 16. He continued:

A: When I went down and I saw the open door on the other floor, I could smell blood.

Q: And what happened?

A: I just sat down there.

Tr., Vol. VI at 16.

The downstairs neighbor to whom Angela ran for help, Robert Wadman ("Wadman"), testified that shortly before the police arrived he saw Alves in the stairwell of the building.

A: And I could see this man, right there, in the corner of the hallway, looked to me like he was curled up in the fetal position and he was whimpering.

Tr., Vol. II at 70.

Q: Did he see you when you saw him near the steps?

A: He lifted his head up and looked at me and then he put his head back down.

\* \* \* \* \* \*

Q: And he didn't lunge at you or do anything menacing towards you, am I correct?

A: No, he did not.

Q: He was sitting there crying?

A: Yes, he was.

Q: An that's how he was when the police arrived?

A: Yes, he was.

Tr., Vol. II at 80.

Sergeant Albert P. Lopes of the Peabody Police Department was one of the first officers on the scene; he confirmed Wadman's testimony and testified that Alves cooperated with him.

A: ... [H]e was in a sitting position with his knees raised and his hands were in his face and he appeared to by (sic) crying a little.

Q: And did he offer any resistance?

A: No, sir.

Q: Did he cooperate with you when you ordered him to do whatever you ordered him to do?

A: Yes, he did.

Tr., Vol. II at 100.

Lopes frisked Alves and then began to question him.

> A: When I asked him what happened he said, knifa, knifa, and made a motion with his hand like this, knifa, knifa. That was the end of the conversation.

Tr., Vol. II at 89.

Alves was placed under arrest (Tr., Vol. 11 at 90), and taken to the police station.

At the station, after being advised of his Miranda rights, police questioned Alves.[5] He provided the following statement to police:

> A: ... I came home around four o'clock. She wasn't home. I slept from 5:00 to 8:00 p.m. Her and her sister came home about 10:00 p.m., and I tried to talk to her to make things better. She went into the bathroom. I called to her and told her how I gave up everything in the old country to be with her. I didn't want to live without her. I didn't have anywhere else to go....

> I got the knife out of the kitchen; I tried to kill myself by putting the knife against the wall and throwing myself on the knife. I knocked on the bedroom door and asked her four times if she was going to stay with me. The door stayed closed and I heard the light go on and off and she didn't respond. I knocked on the door, said, if the door didn't open I would kick it in. Her sister opened the door. I talked with my girlfriend, I said, I gave her everything I had and she said I was crazy. I don't remember what happened after that.

> Q: Question: Did you stab her?

> A: I was holding the knife out, but I can't remember if I stabbed her. She grabbed her side and ran out of the room and her sister (sic), and down-

stairs. I told her sister to run after her, to check on her. Her sister went down to check on her and came back up and said, they were all going to be go (sic) back to Brazil because of what happened.

> Q: Did you go downstairs?

> A: I went downstairs and saw my girlfriend lying on the floor bleeding.

> Q: Question: What hand was he holding the knife in?

> A: I was holding the knife, holding it in my right hand.

> Q: Question: Do you know that she died as a result of what happened at the house? [10]

> A: Subject started crying profusely. I didn't mean to kill her. I couldn't kill her.

> Q: Question: Did he stab his girlfriend?

> A: I don't remember if I stabbed her. The sister could explain it better because she was there. I don't remember if I stabbed her.

Tr., Vol. V at 28–29.

Angela died that same evening at Salem Hospital. The medical examiner testified that Angela had suffered a single stab wound to the left side of her body, and that this wound caused her death. Tr., Vol. III at 17. The wound tract extended through the lung, the chest cavity, the diaphragm, the left side of the liver and into her aorta. *Id.* at 15.

### B. Trial and Appeal

Alves was charged with first degree murder in Angela's death. At trial he was represented by Attorneys Jose Espinosa and Murray A. Kohn. Alves' attorneys attempted to demonstrate throughout the trial that the killing was without malice. At the conclusion of the evidence, the court instructed the jury on the law of first degree murder, second degree murder and manslaughter. Tr., Vol. VII at 73–83.

---

5. Peabody police officer Antonio Santos, who was a fluent speaker of Portugese, relayed the Miranda warning to Alves in Portugese and acted as an interpreter during formal questioning.

10. This apparently was the moment at which Alves first learned that Angela had died.

The judge explained to the jury that first and second degree murder both require a finding of malice. In explaining the concept of malice, the judge told the jury the following:

> A killing may be malicious and consequently, murder, even though the slayer did not wish to cause death. *If a man intentionally and without justification uses upon the person of another, on the body of another, a force, for example, a bullet from a revolver, or a dagger, a force that, as used, would probably do grievous bodily harm to that other person, a force that creates a plain and strong likelihood that the person would die as a result, then that act is malicious within the meaning of the law,* even if the doer of the act was indifferent as to whether or not death would result, or even if the doer of that particular act wished or hoped that death would not result.

Tr., Vol. VII at 76 (emphasis added).

The judge further explained to the jury that manslaughter is defined as the taking of another life without malice. *Id.* at 82.

> When one becomes provoked and sometimes people are provoked, get provoked, and the blood rises, in the heat of passion or anger, sometimes reason gets dethroned. And when and if that happens, then there's just no way that malice aforethought, that state of mind, can exist. And the taking of another's life, even if it is intentional, is called manslaughter. The provocation has to be a provocation that would, on an objective viewpoint, be sufficient to provoke a reasonable person.

Tr., Vol. VII at 82–83.

The judge also instructed the jury generally on the Commonwealth's burden of proof.

> The law says when the government makes an accusation that a man has committed a crime, offended all of society, for that's really the definition of a crime, then the government must show that to his country, by producing evidence which satisfies his country. You people. And how satisfied must you be?

The law says you must be so satisfied beyond all reasonable doubt, from the evidence.

Tr., Vol. VII at 70–71.

At the conclusion of the charge, Alves' counsel stated that he had no objections to the jury instructions. *Id.* at 84.

During deliberations, the jury submitted a question to the court and asked "what part, if anything, malice aforethought had to do with manslaughter." *Id.* at 88. The court gave the following explanation to the jury:

> I defined for you, and I'll do it again right now, murder. And I don't care if it's murder in the first degree, the second degree, the thirty-third degree, whatever. Murder is murder. And murder is by definition the taking of another person's life, the slayer having a particular mindset. That mindset is called malice aforethought. So it is the taking of another's life, the taker possessing at the time he takes that life a particular mindset, a particular state of mind that the law describes as malice aforethought. And although it may include ill will, it may include hatred, it may include revenge, it may include anger, it doesn't have to. It's a mindset wherein an actor has intentionally some wicked intention to do another bodily harm, as well as intending to take his life. But you didn't have to intend to take a life. If you intend to do another grievous bodily harm and the person dies, that was your wicked intent, and you took a life, with that mindset, then that's malice aforethought. That's murder.
>
> Now, there is an entire difference between murder and manslaughter. Both are homicides. Both are where a life is taken by a person. But now, the difference is when you get to manslaughter, again, it's in the state of mind. And the best way to explain it is, when one is provoked, and there has to be some provocation, when one is provoked it might be that one could be so provoked that, really, the blood rises, heat of pas-

sion or anger, just as could be true, for example, on sudden combat. And the blood rises and reason temporarily is dethroned.

If a life is taken under such a heat of passion or heat of blood that was occasioned by provocation, they say if we really, if the reason were so dethroned, you couldn't have that intent, that malicious intent, out of a weakness of, an understanding of persons, the law says, Well, you couldn't have a, an in (sic) state of mind, because of the fact that you had become so angry upon reasonable provocation that the mind a(sic) reason itself is dethroned by this great passion, and a life is taken while you have that state of mind. Law says, well, that isn't malice aforethought because that isn't a wicked intent. And remember, malice aforethought means thought upon beforehand. Can be quick, say I'm going to kill him, and then I kill him right away. That's thought upon beforehand.

\* \* \* \* \* \*

Whereas, in manslaughter, there is no malice aforethought, because there's a provocation that arises, that the provoker has to have some provocation which would cause the ordinary, reasonably prudent fellow to, if I could use that expression, lose one's cool, an anger starts to build up. Heat of passion. Take a hypothetical example. Two fellows having a fight, when one gets hit very hard and horseplay it is not long. As a result of the hit, he becomes angry, loses his, and strikes out, killing the other, might be in the heat of sudden combat.

\* \* \* \* \* \*

[W]hen I said the provocation would have to be as would provocate the ordi-

nary reasonably prudent person of objective standards. Insults, you know, you know that old saying, sticks and stones may break my bones, but names will never hurt me. Well, just mere name-calling or insults, words alone, do not amount to a sufficient provocation. But if there are words, they should be considered in the totality of all of the circumstances as they then were.

Tr., Vol. VII at 88–90, 91–92, 94–95.

The jury ultimately returned a verdict of murder in the second degree. *Id.* at 96.

Alves challenged his conviction in the Massachusetts Appeals Court. In a supplemental brief submitted *pro se*, Alves argued that his trial counsel had rendered ineffective assistance by failing to object to the court's instruction on malice. Respondent's Supplemental Answer to Complaint, # 14, Exh. B at 12–17 [11] Specifically, Alves contended that his trial attorney should have objected to that portion of the court's instructions which told the jury that use of a deadly weapon "is malicious." He argued that the instruction created a mandatory presumption in favor of the government in violation of due process. The Massachusetts Appeals Court affirmed Alves' conviction, stating in part that the instructions given by the trial judge were proper and so counsel did not render ineffective assistance by failing to object to them. # 14, Exh. D at 937, 938. Alves' application to the Massachusetts Supreme Judicial Court for further appellate review was denied. *Id.*, Exh. F.

### III. Analysis

#### A. General Law Regarding Habeas Corpus Petitions

Alves filed his petition in this Court in April 1997; [12] thus, the amendments to

---

**11.** Alves did not mention specifically the portion of the instructions to which he now says his attorney should have objected, but he incorporated by reference a discussion from his original brief (authored by his appellate attorney) submitted to the appeals court. *See* # 14, Exh. B at 12, 15. In that discussion, Alves' appellate attorney directly challenged

the propriety of the instructions, including that portion which told the jury that use of a deadly weapon "is malicious." *Id.*, Exh. A at 34.

**12.** *See* Judge Tauro's opinion, cited at fn. 2, *supra*, for a discussion of the effective filing date for purposes of the statute of limitations.

§ 2254 contained in the Anti–Terrorism and Effective Death Penalty Act ("AEDPA") apply here. *See Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The newly-amended version of 28 U.S.C. § 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(2).

Since Alves' claim of ineffective assistance of counsel was adjudicated on the merits in the Massachusetts Appeals Court, § 2254(d) applies; apparently Alves seeks relief under subsection (d)(1). The question presented, then, is whether the Massachusetts Appeals Court's decision that Alves was not rendered ineffective assistance of counsel was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

For guidance in this task, the Court turns first to the opinion of the First Circuit in *O'Brien v. Dubois,* 145 F.3d 16 (1 Cir., 1998). *O'Brien* sets out a two-step analysis courts should follow in determining whether habeas relief should be granted under § 2254(d)(1):

> First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an "unreasonable application" of Supreme Court precedent.

*O'Brien,* 145 F.3d at 24 (citation omitted).

### B. Applicable Supreme Court Law

The Court's initial inquiry, then, is as follows: Is there "clearly established Federal law, as determined by the Supreme Court of the United States" which controls petitioner's claim? Certainly the general standards for analyzing claims of ineffective assistance of counsel set out *Strickland v. Washington* are important here. *Strickland* teaches that a claim of ineffective assistance of counsel may succeed only if it is shown that 1) counsel failed to render reasonably effective assistance, and 2) the petitioner was prejudiced by counsel's failure. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. An attorney fails to render "reasonably effective assistance" when that assistance is not " 'within the range of competence demanded of attorneys in criminal cases,' " *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052 (quoting *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)), and so falls below an "objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. A court evaluating counsel's performance

> must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

In order to meet the second prong of the *Strickland* test—that of prejudice—the petitioner

> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The Massachusetts Appeals Court rejected Alves' ineffective assistance of counsel claim because it concluded that the instructions given by the trial judge were proper. *Alves,* 35 Mass.App.Ct. at 938, 625 N.E.2d at 562. The Court wrote that "[t]he claim that counsel was ineffective because he failed to object to the judge's instructions ... has no merit, for the reasons stated above." *Alves,* 35 Mass.App. Ct. at 938, 625 N.E.2d at 562. The court's reference was to its earlier discussion of Alves' substantive challenge to the instruction in question. The state court's analysis of that contention was as follows:

> We have reviewed the judge's charge as a whole (to which the defendant did not object). See *Commonwealth v. Albert,* 391 Mass. 853, 857–858, 466 N.E.2d 78 (1984). While a charge to the jury which instructs that malice is to be presumed conclusively from the fact that there was a killing should not be given, see *Commonwealth v. Doherty,* 411 Mass. 95, 100–101, 578 N.E.2d 411 (1991), the instruction the judge gave in this case was entirely different, and it was consistent with the holding in *Doherty.* The judge said nothing more than that an intentional killing without justification or excuse is an unlawful killing with malice aforethought, and is murder. See *Id.* at 100, 578 N.E.2d 411.

*Alves,* 35 Mass.App.Ct. at 937, 625 N.E.2d at 561.

Thus, the state court rejected Alves' ineffective assistance claim under the first prong of *Strickland,* i.e., it determined that since the instruction was not erroneous, counsel acted reasonably in withholding any objection.

If this conclusion was not contrary to nor an unreasonable application of *Strickland,* then habeas relief should be denied. 28 U.S.C. § 2254(d)(1). But in order to make this determination, the Court must next look to the law governing mandatory presumptions in jury instructions. The leading cases in this regard are *Sandstrom* and *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

In *Sandstrom,* the defendant had been charged with murder, but argued that he did not "purposely or knowingly" kill his victim, as required under Montana law for "deliberate homicide." He argued instead he should only be guilty of a lesser charge (presumably something akin to manslaughter). *Sandstrom,* 442 U.S. at 512, 99 S.Ct. 2450. At his trial, he challenged an instruction which told the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. 2450. The instruction was given, the defendant was convicted, and the judge imposed a 100 year sentence. *Id.*

The Supreme Court concluded that the challenged instruction may have been interpreted by the jury as creating a presumption in favor of the government on the element of intent. *Id.* at 519, 99 S.Ct. 2450. Thus, the Court held that the instruction violated the Due Process Clause of the Fourteenth Amendment because it relieved the government of its burden to establish every element of the charge beyond a reasonable doubt. *Id.* at 523–24, 99 S.Ct. 2450 (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

In *Francis v. Franklin,* the Supreme Court invalidated instructions which told the jury that "(1) '[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted' and (2) '[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the pre-

sumption may be rebutted.'" *Francis,* 471 U.S. at 309, 105 S.Ct. 1965. The instructions were given in a murder trial in which intent was the only contested issue. The Court invalidated the instructions, stating that they violated the defendant's due process rights by shifting to him the burden of demonstrating a lack of intent.[13] "The challenged sentences are cast in the language of command.... The jurors 'were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it.'" *Francis,* 471 U.S. at 316, 105 S.Ct. 1965 (quoting *Sandstrom,* 442 U.S. at 515, 99 S.Ct. 2450). In regard to conclusive or irrebuttable presumptions, like those at issue in *Sandstrom,* the Court observed that "[a]n irrebuttable or conclusive presumption relieves the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts." *Francis,* 471 U.S. at 317, 105 S.Ct. 1965.

The law set out in *Sandstrom* and *Francis* was clearly established at the time of the Massachusetts Appeals Court's decision in *Alves* (and indeed, at the time of Alves' trial). *Strickland's* two-pronged test for ineffective assistance of counsel also was clearly established well before the proceedings in Alves' case. Thus, the Court's next task is to determine whether the Massachusetts Appeals Court, in deciding (at least implicitly)[14] that the instruction at issue was not violative of *Sandstrom,* and so that counsel was did not render ineffective assistance of counsel under *Strickland,* reached a decision that was "contrary to, or involved an unreasonable application of" *Sandstrom* and *Strickland.* 28 U.S.C. § 2254(d)(1).

## C. *Strickland v. Washington* Analysis

█ *O'Brien* teaches that in order for a habeas petitioner to be entitled to relief under the "contrary to" language of § 2254(d)(1), the petitioner must show "that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *O'Brien,* 145 F.3d at 24–25 (citation omitted). However, "a petitioner need not point a habeas court to a factually identical precedent." *Id.* at 25.

[T]he key inquiry, at bottom, is whether a Supreme Court rule—by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations—can fairly be said to require a particular result in a particular case.

*O'Brien,* 145 F.3d at 25.

█ Do *Sandstrom/Francis* and *Strickland* require a particular result here? In deciding this question, the Court is mindful of the admonition that "[f]ederal habeas courts should be particularly attentive to a *Sandstrom* claim when the challenged instruction shifts the burden of proof on th[e] most important element of a criminal charge." *Cook v. Foltz,* 814 F.2d 1109, 1112 (6 Cir., 1987).

As quoted, *supra,* the part of the charge which is claimed to be erroneous read as follows:

If a man intentionally and without justification uses upon the person of another, on the body of another, a force, for example, a bullet from a revolver, or a dagger, a force that, as used, would probably do grievous bodily harm to that other person, a force that creates a

---

13. The Court explained that though the instructions allowed the presumptions to be rebutted by the defendant, they "nonetheless relieve[d] the State of the affirmative burden of persuasion on the presumed element by instructing the jury that it must find the presumed element unless the defendant persuades the jury not to make such a finding." *Francis,* 471 U.S. at 317, 105 S.Ct. 1965.

14. Though the state court did not cite U.S. Supreme Court precedent, it did cite Massachusetts precedent which applies the law in *Sandstrom,* and it was clear from Alves' briefs that he was challenging the instruction on federal constitutional grounds.

plain and strong likelihood that the person would die as a result, *then that act is malicious within the meaning of the law,* even if the doer of the act was indifferent as to whether or not death would result, or even if the doer of that particular act wished or hoped that death would not result.

Tr., Vol. VII at 76 (emphasis supplied).

The Court was attempting to define one of the three types of malice under Massachusetts law, the so-called "third prong." In fact, in the very next sentence of the charge, the trial judge referred to the "definition that I have read to you." *Id.* Under state law:

> Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: if, without justification or excuse, (1) the defendant intended to kill the victim (the so-called first prong of malice), or (2) the defendant intended to do the victim grievous bodily harm (the second prong), or (3) in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong).

*Commonwealth v. Sneed,* 413 Mass. 387, 388 n. 1, 597 N.E.2d 1346, 1347 (1992) citing *Commonwealth v. Grey,* 399 Mass. 469, 470 n. 1, 505 N.E.2d 171 (1987).

Although in a later case, the Supreme Judicial Court wrote that the language of the instruction at issue here, given by the same Superior Court Justice on another occasion, was a "most unsatisfactory" explanation of the third prong of malice, *Commonwealth v. Pierce,* 419 Mass. 28, 36, 642 N.E.2d 579, 585 (1994), the problem for present purposes is whether the use of the words "then that act *is* malicious" in the instruction violated the principles of the *Sandstrom* and *Francis* cases. Put another way, were the trial court's instructions the equivalent (or worse) of saying that "then that act *is presumed* to be malicious."

Clearly, if the trial judge had said "then you may *infer* that the defendant acted with malice," the instruction would not have violated the principles enunciated in the *Sandstrom* and *Francis* cases. In fact, over three years before the trial in the instant case, the Supreme Judicial Court stated that the third prong of malice may be proved by inference.

> ...[M]alice aforethought may be *inferred* if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to the common experience there was a strong and plain likelihood that death would follow the contemplated act.

*Grey,* 399 Mass. at 470 n. 1, 505 N.E.2d at 173, (emphasis supplied) citing *Commonwealth v. Chance,* 174 Mass. 245, 252, 54 N.E. 551, 554 (1899); *Commonwealth v. Starling,* 382 Mass. 423, 428, 416 N.E.2d 929, 932 (1981); *Commonwealth v. Swift,* 382 Mass. 78, 83, 413 N.E.2d 717, 719 (1980).[15] But the trial judge did not say "malice may be implied" or "you may infer the act was malicious." Rather, he used the words "is malicious."

One way of looking at the issue is whether the same result would have been reached in the *Sandstrom* and *Francis* cases if the instructions in those cases, rather than using the word "presumes", had used the wording used in the instant case. In other words, would the instruction in *Sandstrom* have been infirm if the trial judge had said: "A person intends the ordinary consequences of his voluntary acts"? And would the instruction in *Fran-*

---

**15.** In the *Chance* case, then Chief Justice Holmes wrote that:

> ...[I]t is possible to commit murder without any actual intent to kill or to do grievous bodily harm... [R]educed to its lowest terms, malice in murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification.

*Chance,* 174 Mass. at 252, 54 N.E. at 554.

*cis* have been defective if the trial judge had said: "The acts of a person of sound mind and discretion are the product of a person's will; a person of sound mind and discretion intends the natural and probable consequences of his acts"? The answer, in my opinion, is "yes." From the standpoint of an average juror, an instruction which uses the word "presumes" and one which flatly states the proposition as a "given" are functional equivalents. Thus, one must look at the instruction as given in the instant case as one would look at an instruction which told the jury "then that act *is presumed to be malicious* within the meaning of the law."

Another question which must be asked, however, is whether the term "malice" contemplates anything over and above its definition. For example, taking the "third prong" definition of malice from the case of *Commonwealth v. Sneed, supra,* suppose the trial judge in the instant case had instructed the jury as follows:

> If the Commonwealth has proved that, in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act, then that act *is malicious* within the meaning of the law (or that the law presumes that that act is malicious).

Would either of these versions of the instruction have been deficient under *Sandstrom* and/or *Francis?* The instruction is an accurate statement of Massachusetts law, for if the Commonwealth does prove these predicate facts beyond a reasonable doubt, it would have proven malice. Other than nullification, how could a jury not find malice if these predicate facts were found? Has the Commonwealth been relieved of any part of its burden of proof?

I think not. The problem in *Sandstrom* and *Francis* was what was presumed was something less than what the prosecution had to prove. In *Sandstrom,* the prosecution had to prove that the defendant "purposefully" or "knowingly" killed the victim. The instruction informed the jury that they could presume that from the acts which were taken. In the *Francis* case, the problem was the same—the prosecution had to prove malice;[16] the offending instructions were that the acts of a person of sound mind are presumed to be the product of the person's will and such a person is presumed to intend the natural and probable consequences of his acts. This is why the Supreme Court wrote in *Francis* that the reason the instructions were infirm was that they ". . .relieve[d] the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts." *Francis,* 471 U.S. at 317, 105 S.Ct. 1965. However, if a correct definition of malice is given, the burden of proof on the prosecution is not removed or lessened.

That being said, any instruction which says thus and so *is (or is presumed to be) malicious* must accurately state the definition of malice under state law in order to pass Constitutional muster. The problem in the instant case is that the trial judge did not just give the definition of the third prong of malice set forth almost a decade before the trial in *Commonwealth v. Starling,* 382 Mass. 423, 426, 416 N.E.2d 929, 931 (1981). Rather, he used a different version which stated that the "use[ ][of] force on the body of another, a force, for example, a bullet from a revolver, or a dagger, a force that as used would probably do grievous bodily harm to that other person. . .is malicious."

---

16. The applicable State law provided as follows:

> "A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being... Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart."

Ga.Code Ann. § 26–1101(a)(1978) quoted in *Francis, supra,* 471 U.S. at 309 n. 1, 105 S.Ct. 1965.

Five years before the trial in the instant case, the SJC had held that language wherein malice is presumed from use of a deadly weapon or that use of a deadly weapon is malicious offends the Constitution. In *Commonwealth v. Nieves,* 394 Mass. 355, 476 N.E.2d 179 (1985), the trial judge gave the following instruction:

'If a man intentionally and without legal justification, excuse or extenuation uses upon the body of another a force, for example, a bullet from a revolver, and that as used would probably do grievous bodily harm to that other and will create a plain and strong likelihood that the other will die as a result, the act implies malice within the meaning of the law .... And our law says, when the killing is caused by the intentional use of a deadly weapon, there arises a presumption of malice aforethought.... Hence in this case, if you find that ... the Defendant ... took out a gun and fired it at [the victim] and killed him without justification or excuse or any extenuating circumstances to reduce it to manslaughter, then that is murder with malice aforethought, murder in the second degree.'

*Nieves,* 394 Mass. at 357, 476 N.E.2d at 181.

The SJC concluded that a reasonable jury could have interpreted the charge as establishing a mandatory presumption in favor of the Commonwealth, and that the charge therefore violated *Sandstrom.* Id. at 360–61, 476 N.E.2d at 183.[17]

Furthermore, an instruction which told a jury that malice is presumed when a weapon is used has been struck down by the U.S. Supreme Court under the rule in *Sandstrom* and *Francis.* In *Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), *overruled on other grds., Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the state court jury was instructed:

'I tell you, however, that if the facts proven are sufficient to raise a presumption of malice, that presumption is rebuttable, that is, it is not conclusive on you, but it is rebuttable by the rest of the evidence. *I tell you, also, that malice is implied or presumed from the use of a deadly weapon.* I further tell you that when the circumstances surrounding the use of that deadly weapon have been put in evidence and testified to, the

---

**17.** Additional Massachusetts cases, all but one of which predating the decision in *Nieves,* have held that the jury may be instructed that malice may be inferred from the use of the deadly weapon only if the judge makes it clear that that conclusion is not mandated. For instance, in *Commonwealth v. Lowe,* 391 Mass. 97, 461 N.E.2d 192 (1984), the court found no error in an instruction stating "a jury *may* draw a permissible inference that [use of a deadly weapon] is malicious.... [M]alice *may* be proved from the intentional use of a deadly weapon." *Id.* at 111 n. 10, 461 N.E.2d at 201 (emphasis added).

However, other cases predating *Nieves* permitted language which mentioned a presumption in certain circumstances. In *Commonwealth v. Stirk,* 16 Mass.App.Ct. 280, 450 N.E.2d 1110 (1983), *aff'd,* 392 Mass. 909, 467 N.E.2d 870 (1984), the court expressly approved of an instruction which stated "[w]here the killing is caused by the intentional use of a deadly weapon—a knife, a gun are deadly weapons—malice may be inferred unless by the evidence of all the facts and circumstances it's disproved in your minds." 16 Mass.App.Ct. at 285 n. 3, 450 N.E.2d at

1114. *See also Commonwealth v. Festa,* 388 Mass. 513, 515, 447 N.E.2d 1, 2 (1983) (conviction affirmed where no objection lodged and sole issue at trial was identity of the perpetrator); *Commonwealth v. Dunker,* 23 Mass.App.Ct. 64, 72, 499 N.E.2d 303, 308 (1986) (instruction setting out rebuttable presumption regarding use of deadly weapon allowed where main defense at trial was alibi).

An instruction regarding the use of a deadly weapon was approved in the face of a *Sandstrom* challenge in *Commonwealth v. Doucette,* 391 Mass. 443, 462 N.E.2d 1084 (1984). But there, the court emphasized that the instructions as a whole made it clear to the jury that the presumption was not mandatory, especially since the trial judge also told the jury that "all presumptions of law independent of evidence are in favor of innocence." *Id.* 391 Mass. at 451–52, 462 N.E.2d at 1092–93.

However, it is unclear whether *Stirk* and *Doucette* remain viable in view of the Supreme Court's recent opinion in *Yates v. Evatt,* 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), discussed, *infra.*

presumption is removed. And it ultimately remains the responsibility for you, ladies and gentlemen, under all the evidence to make a determination as to whether malice existed in the mind and heart of the killer at the time the fatal blow was struck.'

*Yates*, 500 U.S. at 397, 111 S.Ct. 1884 (citation omitted, emphasis added).

The Court took little time in concluding that the instruction clearly was violative of *Sandstrom*. *Id.* at 401–02, 111 S.Ct. 1884. Although *Yates* was not decided at the time of Alves' trial and appeal and therefore cannot itself provide the basis for habeas relief, the result there applied the rule in *Sandstrom* and *Francis* to the situation where instructions equate the use of a deadly weapon with malice and confirmed the correctness of the SJC's decision in *Nieves*.

Again, I do not think that eliminating the word "presumes" from the instructions in *Nieves* and *Yates* cases would have changed the result. Thus, if in *Nieves*, the trial judge had instructed the jury that "a killing caused by the intentional use of a deadly weapon is done with malice aforethought" or if the trial judge in the *Yates* case has instructed the jury that "use of a deadly weapon is malice," the results in those cases would not have been different.

■ So what of the instruction in the instant case? In my opinion, as stated,

*supra*, the instruction passes Constitutional muster only if the definition of malice given by the judge contained all of the elements which the Commonwealth must prove in order to establish malice. If it did not, the instruction had the effect of relieving the Commonwealth of proving all the elements of malice in order to obtain a conviction for second degree murder.

In order to decide this question, it is necessary to parse the elements of malice which were contained in the instruction. These are:

(1) The defendant intentionally and without justification,

(2) Uses force on the person or body of another,

(3) A force (such as a bullet from a revolver or a dagger), force which as used, would probably do grievous bodily harm to that other person, and

(4) A force that creates a plain and strong likelihood that the person would die as a result.[18]

Under state law, if the Commonwealth proves those four elements beyond a reasonable doubt, would it have proven malice under state law? Parsing out the third prong of malice, the Commonwealth would have to prove that:

(1) The defendant acted without justification or excuse,

---

**18.** The trial judge's reference to "a bullet from a revolver or a dagger" is, in my opinion, an attempt to provide examples of types of forces. The clauses following these examples proceed to clarify when the use of one of these forces constitutes "malice."

One might read the trial judge's reference to use of a dagger in a different way. Under this reading, the trial judge's reference to "a bullet from a revolver or a dagger" is an initial attempt to provide examples of a larger category of use of force which he then defines, i.e., those forces which would probably do grievous bodily harm and would create a plain and strong likelihood of death. If the instruction is read this way, the trial judge has essentially said to the jury: "Here is the legal definition of malice. But before I give that to you, let me give you some samples of

the type of force that will fall within that definition. Use of a dagger is an example of the type of force I am about to define." Read this way, the instruction comes perilously close to telling the jury that use of a dagger is malicious and would, consequently, be problematic.

But I do not read the instruction that way, nor do I think that the jury would have understood the instruction in that way. Further, I do not think a failure to read the instruction in this way could provide the grounds necessary to satisfy the first prong of *Strickland*.

Lastly, while I do believe it may have been unduly suggestive for the trial judge to use an example of force - use of a dagger - which highlighted the actual weapon used in the case, I do not see any Constitutional ramifications flowing from that use.

(2) In the circumstances known to the defendant at the time he acted, when he acted,

(3) a reasonably prudent person would have known that, according to common experience, that there was a plain and strong likelihood that death would follow the act.

Comparing the two instructions as parsed, has the Commonwealth been relieved of proving any of the elements of malice? I think not. First, the instruction correctly stated that in order to find malice, the jury must find that the defendant acted without justification.[19] Second, the trial judge instructed the jury that the act had to be such that there was a plain and strong likelihood that death would result from the act. What the trial judge did was to be more specific as to the act by employing the term "use of force." The real question is this: did the trial judge, in stating that malice exists when a person "uses force (such as a bullet from a revolver or a dagger) which as used would probably do grievous bodily harm to another person" say anything substantially different than if he had said that malice exists when a person, "does an act knowingly in a situation in which a reasonable person would have known that there was a plain and strong likelihood that death would result."

I do not think so. In sum, I do not see any way in which a jury could find that a reasonably prudent person could not have known that there was a plain and strong likelihood that death would result if a person uses force on the person of another which, as used, would probably do grievous bodily harm to the other person. One would have to posit a situation in which a reasonably prudent person would not have known there was a strong and plain likelihood of death if there was an unjustified intentional use of force (such as a bullet from a revolver or a dagger) which, as used, would probably do grievous bodily

harm to the other person. I cannot fathom a factual scenario in which this finding would be possible.

Accordingly, I rule that the trial judge's instruction, unsatisfactory though it was under state law, did not have the effect of relieving the Commonwealth of its burden of proving malice. Further, it is my opinion that a jury could not reasonably have understood the instruction as relieving the prosecution of proving malice or any of the constituent elements of malice. The petitioner's rights under the Due Process Clause were not violated. It follows that trial counsel's failure to object to the instruction did not constitute ineffective assistance.

Of course, there also was evidence from which the jury could have found the defendant guilty of manslaughter. Clearly, the question of whether the defendant acted with malice was the crucial issue at trial. Massachusetts law allows a conviction for manslaughter instead of murder where " ' person kills another in the heat of passion, which is occasioned by adequate and reasonable provocation, or in sudden combat, . . . even though that person had an intent to kill.' " *Commonwealth v. Acevedo,* 427 Mass. 714, 716, 695 N.E.2d 1065, 1067 (1998) (citation omitted). The uncontroverted evidence at trial showed that Alves pushed or slapped Angela and that she fell onto the bed, and that Ana then pushed Alves onto the bed and fell on top of him. Thus, this certainly was a case in which a killing could be found to have followed "sudden combat."

Furthermore, additional evidence was presented which could have supported a verdict of manslaughter. Alves inflicted only a single wound upon Angela, evidence which one might argue indicates a lack of intent to injure or kill. The nature of the victim's wound may provide some evidence of whether the defendant acted with intent. *Commonwealth v. King,* 374 Mass.

---

**19.** The fact that the trial judge did not use the word "excuse" is immaterial to the Constitu- tional analysis.

501, 507, 373 N.E.2d 208, 211 (1978) ("The knife wounds themselves look like the consequences of an untoward, foolish introduction of a dangerous weapon in a fight not otherwise at a lethal pitch.") (citations omitted); *cf. Commonwealth v. Johnson*, 426 Mass. 617, 622, 689 N.E.2d 1327, 1332 (1998) (fact that "defendant shot the victim three times, twice at close range while the victim lay helpless on the street," left little doubt that the defendant acted with malice). Further, Alves testified that he placed the knife in his belt only because he had given up on his suicide attempts; the note Alves wrote that evening could reasonably be interpreted as a suicide note, and so could corroborate Alves' explanation for why he carried a knife.[20] Alves' suicidal intent is corroborated by Ana's testimony that she heard Angela say to Alves, "[D]on't you have any love for your mother. Think of your mother." Tr., Vol. III at 41. Thus, there is at least some evidence that when Alves brought the knife into Angela's bedroom, he had no intention to use it to stab her, that instead he possessed the knife only because he had just attempted suicide and abandoned the effort. If the jury accepted this evidence, then the knife was "an instrument not of design but of opportunity." *King*, 374 Mass. at 507, 373 N.E.2d at 211.

Also, Alves' behavior immediately after he stabbed Angela arguably could tend to show he acted without malice. As soon as Angela ran from the room, he told Ana to "go after her because he had hurt her." Tr., Vol. IV at 11–12. Alves testified that he then went downstairs to check on Angela. Tr., Vol. VI at 16. When he saw her lying on the floor and bleeding, he did not run, but sat down and cried. He remained seated on the stairs, seen by Wadman, until the police arrived. When police asked him what happened, he explained, "knifa, knifa." He cooperated with police and gave them a statement when he arrived at the police station. He did not deny his involvement with Angela's stabbing, but only claimed he could not remember what happened after Ana pushed him onto the bed. Tr., Vol. V at 28–29. *Cf. Commonwealth v. Amazeen*, 375 Mass. 73, 80–81, 375 N.E.2d 693, 699 (1978) (jury allowed to infer intent to kill from evidence showing disposal of evidence, flight, and lying to police); *Commonwealth v. Simmons*, 419 Mass. 426, 432–33 n. 6, 646 N.E.2d 97, 101 (1995) (jury could properly find malice from evidence that defendant washed the knife and his hands after stabbing the victim, inflicted two less serious stab wounds on himself, and stood outside the door while victim lay dying on the other side).[21]

Thus, the jury in this case may very well have returned a verdict of manslaughter. However, it is to be recalled that the trial judge instructed that jury that malice existed when "...a man *intentionally* uses upon the person of another, on the body of another, a force...". He defined manslaughter as "the taking of another's life, but without the state of mind, malice aforethought." Tr., Vol. VII at 82.

I note further that during deliberations, the jury questioned the judge as to what, if

---

20. The Commonwealth argued at trial that the note instead showed Alves intended first to murder Angela and then to kill himself, and so supported a verdict of first degree (premeditated) murder.

21. That is not to say that the evidence was one-sided. Ana testified that as Alves stood outside the bedroom door, he yelled, "Angela, you have decided not to live with me anymore. If you are not going to live with me, you will not live with anyone else." Tr. Vol. III at 42. Ana also testified that when Alves entered the room, he stood before Angela and yelled, "Angela, you are my problem, you are my problem, you are my problem." The fact that Alves carried the knife into the bedroom could provide evidence of intent; a jury could find incredible Alves' claim that he placed an eight-inch knife in his belt without further plans to use it and walked from the kitchen (from which he had obtained the knife) to the bedroom. It might be argued that the fact that the knife apparently penetrated several inches through Angela's abdomen and into her aorta indicates Alves intended to kill or inflict grievous bodily harm. Thus, there is no claim that the evidence was insufficient for the jury to return a verdict of murder in the second degree.

anything, malice had to do with manslaughter. *Id.* at 88. The judge responded with instructions somewhat more favorable to the defendant because he did not mention the so-called "third prong" of malice at all.[22] Rather, he talked about malice being a "particular mindset" telling the jury that:

> It's a mindset wherein an actor has intentionally some wicked intent to do another bodily harm, as well as intending to take his life. But you didn't have to intend to take a life. If you intend to do another grievous bodily harm and the person dies, that was your wicked intent, and you took a life, with that mindset then that's malice aforethought.

Tr., Vol. VII at 89.

This instruction encompassed only the first and second prongs of malice as set forth in the cases. *Commonwealth v. Sneed, supra,* 413 Mass. at 388 n. 1, 597 N.E.2d at 1347. The fact that the third prong was not mentioned, since it requires neither an intent to kill nor an intent to do grievous bodily harm, probably was a benefit to the defendant.

Nonetheless, the trial judge adequately distinguished manslaughter, saying that:

> Now, there is an entire difference between murder and manslaughter. Both are homicides. Both are where a life is taken by a person. But now, the difference is when you get to manslaughter, again, it's in the state of mind. And the best way to explain it is, when one is provoked, and there has to be some provocation, when one is provoked it might be that one could be so provoked that, really, the blood rises, heat of passion or anger, just as could be true, for example, on sudden combat. And the blood rises and reason temporarily is dethroned.
>
> If a life is taken under such a heat of passion or heat of blood that was occasioned by provocation, they say if we really, if the reason were so dethroned, you couldn't have that intent, that malicious intent, out of weakness of, an un-

derstanding of persons, the law says, Well, you couldn't have a, an in (sic) state of mind, because of the fact that you had become so angry upon reasonable provocation that the mind and reason itself is (sic) dethroned by this great passion, and life is taken while you have that state of mind. Law says, well, that isn't malice aforethought because that isn't a wicked intent.

Tr.,Vol. VII, pp. 89–90.

In my opinion, the distinction between the degrees of murder and manslaughter were adequate, and the instructions of the trial judge at issue here, although subject to valid criticism, did not relieve the Commonwealth of any part of its burden of proof on the issue of malice, did not mislead the jury into thinking that they could find malice on any showing less than that required by state law, and, taking the instructions as a whole, did not operate so as to blur the distinction between second degree murder and manslaughter. Trial counsel for the defendant did not render ineffective assistance by failing to object to them.

### IV. Conclusion

For all of the reasons given, I RECOMMEND that the petitioner's petition for relief under 28 U.S.C. § 2254 be DENIED.

### V. Review by the District Judge

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Clerk within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this

---

**22.** The instructions are reproduced at some- what greater length at pp. 53–54, *supra.*

Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378–79 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980). *See, also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).